IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

RICHARD ANTHONY WILFORD,

Defendant.

Criminal No.: ELH-11-258
Related Civil No.: ELH-19-1926

**MEMORANDUM OPINION**

This Memorandum Opinion resolves a post-conviction petition filed pursuant to 28 U.S.C. § 2255, as well as a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), submitted by or on behalf of defendant Richard Anthony Wilford.  In December 2013, a jury in the District of Maryland convicted Wilford of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine.  ECF 267.  The Court sentenced Wilford to 340 months of incarceration.  ECF 353; ECF 354.  He is currently serving his sentence at FCI Victorville.  *See* ECF 663 at 1.

Largely through appointed counsel, Wilford has filed a "Motion to Vacate or Correct Illegal Sentence."  ECF 546.  It has twice been supplemented.  ECF 615; ECF 659.  I shall refer to ECF 546, ECF 615, and ECF 659 collectively as the "Petition."  The government has responded in opposition.  ECF 640; ECF 673.  And, Wilford has replied.  ECF 650; ECF 674.

Wilford has also filed a pro se "Motion for a Reduction in Sentence Pursuant to the First Step Act and the Changes to the Compassionate Release Statute and 18 U.S.C. § 3582(c)(1)(A)(i)."  ECF 595.[1]  It has been supplemented five times.  ECF 602; ECF 606; ECF 622; ECF 635; ECF

---

[1]  The Federal Public Defender declined to represent Mr. Wilford in regard to compassionate release. ECF 601.

663.  I shall refer to ECF 595 and the five supplements collectively as the "Motion."  The government opposes the Motion.  ECF 629.

The submissions are accompanied by various exhibits.  In addition, Wilford has filed several other motions and submissions.

No hearing is necessary to resolve the motions.  *See* 28 U.S.C. § 2255(b); Local Rule 105.6. For the reasons that follow, I shall deny the Petition, but I shall grant the Motion in part, reducing Wilford's sentence to 280 months of imprisonment.

## I.  Factual and Procedural Background[2]

## A. Indictment, Trial, Sentencing, and Appeal

On May 5, 2011, a federal grand jury in Maryland returned an Indictment against Wilford and five others:  Lawrence Lee Hayes, Jr.; Bryan Eammon Williams; George Lamar Plunkett; Mark Anthony Hawkins; and Robert Nyakana.  They were charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture or substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  ECF 1.  According to the Indictment, the conspiracy spanned the period from August 2010 to May 2011.  *Id*.  A Superseding Indictment was filed on August 25, 2011, adding a forfeiture count.  ECF 59; *see also* ECF 60; ECF 61.

An arrest warrant was issued for Wilford on May 5, 2011.  ECF 6.  Law enforcement authorities located Wilford in California in August 2011, and attempted to arrest him there, without success.

On August 8, 2011, while Wilford was still at large, the government filed a "Consent Motion to Exclude Time Pursuant to the Speedy Trial Act" (ECF 57), seeking to exclude time

---

[2] Where relevant, I draw on the procedural and factual background set forth in my opinions of June 7, 2013 (ECF 205), November 27, 2013 (ECF 252), and February 26, 2016 (ECF 445), which are incorporated here.

under the Speedy Trial Act, 18 U.S.C. § 3161, "for the period from the first initial appearance in the case (May 17, 2011) through to the final trial date to be set in this case." ECF 57 at 7. By this point, four of Wilford's codefendants had been arrested. *Id*. at 1.[3] The Court granted the motion. ECF 58.

Wilford was apprehended in Baltimore on September 16, 2011. On that date, he appeared before Magistrate Judge Beth Gesner for an initial appearance. ECF 64.[4] At the hearing, he was represented by retained counsel, William B. Purpura, Jr.[5] *See* ECF 291 at 1-3 (Tr. of Sept. 16, 2011).[6] At that hearing, Purpura advised the court that the defendant had received a copy of the Indictment. *Id*. at 3. Judge Gesner then advised Wilford that he had been charged in a Superseding Indictment with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846. She also informed him of the maximum penalty, if convicted; the mandatory minimum penalty, if convicted; and the forfeiture count. *Id*. at 3-4. The defendant indicated that he understood the charge and the possible penalty. *Id.* at 4. Thereafter, Judge Gesner advised the defendant of his rights. The defendant was sworn and, under oath, he stated that he understood "everything so far[.]" *Id.* at 5.

---

[3] Wilford and codefendant Robert Nyakana had not yet been arrested. Nyakana did not have his initial appearance until June 4, 2012. ECF 114.

[4] Unlike an arraignment, an initial appearance does not require a plea. *Compare* Fed. R. Crim. P. 5 (governing initial appearances) *with* Fed. R. Crim. P. 10 (governing arraignments).

[5] Purpura did not formally enter his appearance as counsel for Wilford until December 9, 2011. *See* ECF 85.

[6] A transcript of the initial appearance is also appended to the government's second opposition to the Petition. *See* ECF 673-1.

At the conclusion of the proceeding, Judge Gesner asked: "[D]o you want to do an arraignment while you are here?"  ECF 291 at 7.  Defense counsel responded: "I would ask not for this -- for a lot of reasons, but no."  *Id.*

Prior to trial, neither the government, Wilford, nor his lawyer ever called the Court's attention to the fact that no arraignment had been held.  This certainly was not due to a general hesitancy to communicate with the Court.  Indeed, during the pendency of the case, the Court held several scheduling conferences with counsel.  *See*, *e.g.*, ECF 69; ECF 86; docket entry of August 26, 2013; docket entry of August 27, 2013; ECF 234; ECF 244.  Moreover, on several occasions, Wilford personally wrote to the Court and he filed pro se motions.  *See*, *e.g.*, ECF 197, ECF 198, ECF 202, ECF 203, ECF 208, ECF 235, and ECF 256.  In addition, defense counsel filed numerous pretrial motions.  *See*, *e.g.*, defendant's "Motion to Suppress Tangible and Derivative Evidence" (ECF 92); "Defendant's Motion to Compel Disclosure of Promises of Immunity, Leniency, or Preferential Treatment and Disclosure of Exculpatory Information and Points and Authorities in Support Thereof" (ECF 93); "Motion for an Order Directing the Government to Provide *Brady/Giglio/Jencks* Material" (ECF 94); "Motion for Disclosure Pursuant to Fed. R. Evid. 404(b) and 609" (ECF 95); "Motion for Pretrial Procedures Regarding Recordings" (ECF 96); "Addendum to Motion to Suppress Tangible and Derivative Evidence Pursuant to Federal Rule 12(b)(3) and Request for a *Franks* Hearing" (ECF 97); "Supplemental and Consolidated Motion to Suppress Tangible and Derivative Evidence" (ECF 160); and "Motion for Disclosure of Relevant Evidence Withheld by the Government and Request for Immediate Hearing."  ECF 166.  An additional submission is docketed at ECF 180.[7]

---

[7] The government responded to the motions at ECF 165, ECF 173, and ECF 181.

In general, the suppression motion docketed at ECF 160 challenged evidence derived from surveillance conducted by law enforcement officers by means of Global Positioning System ("GPS") tracking devices and court-authorized "pinging" of cellular phones.  Relying on the Supreme Court's then-recent decision in *United States v. Jones*, 565 U.S. 400 (2012), which ruled that GPS tracking constitutes a search under the Fourth Amendment, Wilford maintained that the warrantless use of GPS tracking technology violated his Fourth Amendment rights.  Additionally, Wilford asserted that, despite court authorization obtained under Maryland's pen register and trap and trace statute, Md. Code (2020 Repl. Vol., 2021 Supp.), §§ 10-4B-01 *et seq.* of the Courts and Judicial Proceedings Article, the pinging of his cellular phone was not authorized by the statute, and was conducted in violation of Maryland law and the Fourth Amendment.  Thus, under the Fourth Amendment's exclusionary rule, Wilford sought to suppress evidence derived from the warrantless use of GPS and the cell phone pinging.  Wilford also requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), challenging several search warrants obtained during the investigation.

In the motion docketed at ECF 166, Wilford sought evidence allegedly withheld by the government, including internal memoranda circulated by "various law enforcement agencies" pertaining to GPS tracking, in light of the decision in August 2010 in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010).  In that case, the court determined that the warrantless use of a GPS device to track a target vehicle's movements for 28 days constituted an illegal search under the Fourth Amendment.  According to Wilford, these materials were relevant to ECF 160.

---

On January 13, 2013, the defense filed a "Motion to Withdraw Request for GPS Data," because it had been provided by the government. ECF 171. I granted the motion. ECF 172.

The Court held a motions hearing on January 25, 2013.  ECF 174.  After the hearing in January 2013, counsel submitted supplemental briefing.  *See* ECF 180 (defense); ECF 181 (government).  Then, the Court held another motions hearing on March 8, 2013.  ECF 182.  And, on May 22, 2013, Wilford filed a pro se "Motion to Compel the Government to Disclose All Discovery That May Be Relevant and Material to Defendant's Defense."  ECF 197.

By Memorandum Opinion (ECF 205) and Order (ECF 206) of June 7, 2013, the Court denied the motion to suppress (ECF 160), but granted the motion for disclosure (ECF 166), in part.  *See United States v. Wilford*, 961 F. Supp. 2d 740 (D. Md. 2013), *aff'd*, 689 Fed. App'x 727 (4th Cir. 2017).  I ruled that Wilford had no standing to challenge the GPS tracking and pinging of certain vehicles and cell phones.  ECF 205 at 25-27.  Furthermore, I concluded that because the government's warrantless use of GPS tracking devices preceded *Jones*, the government was entitled to rely on the good faith exception to the exclusionary rule, articulated in *United States v. Leon*, 468 U.S. 897 (1983).  ECF 205 at 27-42.  In the alternative, I found that suppression would be inappropriate under the doctrines of inevitable discovery and independent source.  *Id*. at 43-45.  As for the cell phone pinging, I concluded that, even assuming, *arguendo*, that pinging does not fall within Maryland's pen register statute, this did not supply a basis for exclusion; there was no Fourth Amendment violation.  *Id*. at 45-54.  And, I found that defendant had not met his burden for a *Franks* hearing.  *Id*. at 54-61.

However, I found that Wilford was entitled to certain documents included within his request at ECF 166, and granted that motion in part.  *Id*. at 21-25.  And, my denial of ECF 160 was without prejudice to Wilford's right to renew his argument as to the inapplicability of the good faith defense as to the warrantless use of GPS trackers, based on documents that might be produced by the government in response to ECF 166.

In a letter docketed on June 25, 2013, Wilford wrote to the Court with complaints about his lawyer.  ECF 208.  He also expressed his disagreement with the Court's ruling in ECF 206.  Based on Wilford's correspondence, the Court referred the matter to a magistrate judge for an attorney inquiry hearing.  ECF 210; *see also* ECF 209.  Magistrate Judge Gesner conducted that hearing on July 3, 2013.  ECF 212.

Thereafter, Purpura remained as counsel and, on July 25, 2013, he filed a "Request to Reconsider Court's Order Denying Suppression and Request for *Franks* Hearing Based On New Discovery."  ECF 217.  Defense counsel raised several issues as to cell phone pinging; sought a *Franks* hearing and reconsideration of the Court's good faith analysis based on an email produced by the government in response to ECF 166; and contended that the government was required to obtain a warrant before using GPS tracking devices for defendant's two vehicles, because they were located in defendant's garage, which also undermined the good faith analysis.  ECF 217.[8]

In response to ECF 217, the Court held a motions hearing on November 6, 2013.  *See* ECF 246.  This culminated in a Memorandum (ECF 252) and Order (ECF 253) of November 27, 2013, granting ECF 217 in part and denying it in part.  Specifically, I suppressed all evidence as to the location of the vehicles at the garage of Wilford's Elkton residence.  ECF 252 at 10.  I otherwise denied the motion, and also found any remaining defense issues "to be without merit."  *Id.*

In August 2013, the government provided notice under 21 U.S.C. § 851 that, if convicted, Wilford would be subject to an enhanced penalty under 21 U.S.C. §§ 841(b)(1)(A) and 851.  ECF 227.  At the time, 21 U.S.C. § 841(b)(1)(A) provided for a mandatory minimum sentence of twenty years of imprisonment for an individual convicted of one prior felony drug offense.  The

---

[8] The last issue was raised more precisely by defense counsel in a letter prior to the motion hearing. *See* ECF 243. The government argued that this issue was raised belatedly. *See* ECF 250. I agreed, but nevertheless considered it on the merits and rejected it. ECF 252 at 2.

government indicated that it intended to rely upon Wilford's federal drug convictions in case JFM-92-0116 or case MJG-01-0399, discussed *infra*.

During the pendency of the case, Wilford's five codefendants all pled guilty.  Wilford proceed to trial on December 11, 2013.  At the outset of trial, both the government and defense counsel confirmed, under "*Lafler*," that Wilford had rejected a plea offer from the government in April 2012.  ECF 308 (Tr. of Dec. 11, 2013) at 12-15; *see Lafler v. Cooper*, 566 U.S. 156 (2012). That plea offer contemplated a sentence below any mandatory minimum.  *Id*. at 13, 14.  Purpura also stated, *id*. at 14: "At Mr. Wilford's request, I just recently, before start of trial, offered a resolution, which was rejected by the government.  It wasn't the government suggested.  It was defense, Mr. Wilford suggested it."

Trial by jury commenced on December 11, 2013.  ECF 257.  On December 18, 2013, the jury found Wilford guilty of conspiracy to distribute five kilograms or more of cocaine.  ECF 267; ECF 268.

The following summary of the evidence at trial is drawn from the government's submission for the Presentence Report (ECF 273, the "PSR").  Law enforcement's investigation of Wilford's coconspirator, Lawrence Lee Hayes, Jr., commenced in late August and early September of 2010. *Id*. ¶ 7.  In October of 2010, investigators observed Hayes and Wilford on two occasions.  *Id*.  At both meetings, Hayes and Wilford met at 30th and St. Paul Streets in Baltimore.  *Id*.  During the first meeting, Wilford took a large cardboard box from his Ford pick-up truck and gave it to Hayes. *Id*.  During the second meeting, Wilford took a backpack from Hayes's car and Hayes took a large cardboard box from Wilford's pick-up truck.  *Id*.  The boxes exchanged between Wilford and Hayes during both meetings were identical in size.  *Id*.  After both meetings, Hayes left alone and drove to 1190 W. Northern Parkway, *i.e.*, the Belvedere Towers Apartments ("Belvedere

Towers"), and took the cardboard boxes inside.  ECF 273, ¶ 7.  It was later determined that the apartment was rented and occupied by coconspirator Michael Smooth.  *Id*.

In mid October 2010, the investigating agents learned from a confidential source that Wilford was involved in drug trafficking with Hayes.  *Id*. ¶ 8.  After the October meetings, agents conducted a background check of Wilford and learned that he owned a large home on Rock Hollow Court in Cecil County, Maryland, and a residence in Baltimore City, located at 1500 Cliftview Avenue.  *Id*.  In November 2010, agents observed coconspirator George Plunkett exit and then return to a residence located at 301 W. 27th Street in Baltimore.  *Id*. ¶ 9.  Agents also observed Wilford and Hayes meet at 30th and St. Paul Streets on November 12, 2010.  *Id*.

Surveillance continued and on December 2, 2010, agents again saw Hayes and Wilford meet at 30th and St. Paul Streets in Baltimore.  *Id*. ¶ 10.  Plunkett's vehicle was also located in the area.  *Id*.  Hayes then left the location and again went to Belvedere Towers with Plunkett.  *Id*.  Plunkett took a large cardboard box and carried it into the apartment building.  *Id*.  About two weeks later, agents observed Hayes and Wilford at 30th and St. Paul Streets.  *Id*.  Hayes exited his vehicle and entered Wilford's vehicle.  *Id*.  They later left the area in Wilford's vehicle and went to Belvedere Towers.  *Id*.  Hayes exited Wilford's vehicle carrying a large cardboard box.  *Id*.  The boxes appeared to be the same size as the boxes exchanged between Wilford and Hayes in October 2010.  In addition, in January 2011, agents learned that Wilford, using a fictitious name, was shipping packages to a fictitious person in California.  *Id*. ¶ 11.

In February 2011, agents observed Hayes enter apartment 717 at Belvedere Towers, carrying a large cardboard box.  *Id*. ¶ 12.  Plunkett entered the apartment a few minutes later.  *Id*.  The men then left the apartment.  *Id*.  Plunkett was seen carrying two large cardboard boxes and a small white plastic bag, which he tossed into a nearby dumpster.  *Id*.  The agents then went to the

dumpster and recovered four computer boxes, two Compaq computer shells, and the bag that Plunkett had discarded.  ECF 273, ¶ 12. The bag contained drug packaging material with cocaine residue, as well as other drug packaging paraphernalia.  *Id*.  One of the boxes had a shipping label with a recipient address of 35 Mainview Court in Reisterstown, Maryland, a residence owned by coconspirator Derrick Barbour.  *Id*.  The investigation revealed that Wilford's vehicle was at 35 Mainview Court on February 9, 2011, at the same time that the package was delivered to the residence.  *Id*.  The boxes were the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.

On March 15, 2011, Hayes was observed standing next to his vehicle, which was parked at 301 W. 27th Street in Baltimore. *Id*. ¶ 13.  Wilford was also present, standing next to his vehicle. *Id*.  Hayes then placed two bags into Wilford's vehicle and each coconspirator left the area in his own vehicle.  *Id*.

Two days later, on March 17, 2011, Wilford and coconspirator Mark Hawkins were seen at a Staples store in Towson.  *Id*. ¶ 14.  Wilford was observed exiting the Staples store with boxes and packaging material.  *Id*.  The boxes were described as looking smaller than the boxes exchanged between Wilford and Hayes in October and December 2010.  *Id*.  Wilford and Hawkins appeared to be preparing several boxes for shipment.  *Id*.  Wilford placed two boxes in Hawkins's vehicle and then took one of the boxes into the Staples store.  *Id*.  Wilford took the other two boxes to other Staples stores.  *Id*.

Agents then obtained a shipping manifest from the Towson Staples store and learned that Wilford's package listed the sender and receiver under the same fictitious names that agents learned about earlier.  *Id*.  The package was again destined for California.  *Id*.  The agents obtained

a search warrant for the package.  A search of the box revealed a hollowed-out DVD/VCR player containing $100,000 in cash.  ECF 273, ¶ 14.

About two weeks later, on March 30, 2011, agents observed Wilford and Hawkins meeting in Baltimore City.  *Id*. ¶ 15.  At the meeting, Wilford gave Hawkins a large cardboard box, which was the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.  Hawkins took the box to 1500 Cliftview Avenue and placed the box inside of the residence.  *Id*.  Shipping records revealed that a package was delivered to 35 Mainview Court on that same day.  *Id*.

On April 1, 2011, Wilford met with Hayes and Plunkett at a barbershop in Baltimore.  *Id*. ¶ 16.  Later that day, Wilford was observed entering the residence located at 1500 Cliftview Avenue.  *Id*.  Agents observed a DVD/VCR player in the rear of Wilford's vehicle, identical to one seized on March 17, 2011.  *Id*.  Later that day, Hawkins, along with Anthony Uzondo and Pierre Bantan, were observed exiting 1500 Cliftview Avenue.  *Id*.  Testimony at trial revealed that Uzondo and Bantan flew from Los Angeles to Baltimore on April 1, 2011, and packaged and transported money back to California that same day.  *Id*.

On April 3, 2011, law enforcement agents in Clark County, Illinois, stopped a Penske tractor trailer truck operated by defendant Robert Nyakana.  *Id*. ¶ 17.  He consented to a search of the trailer.  *Id*.  During the search of the trailer, law enforcement discovered approximately 136 kilograms of cocaine inside ten black bags.  *Id*.  The cocaine had a street value of $13.6 million.  ECF 183 (Nyakana Presentence Report), ¶ 12.  The agents learned that the cocaine was loaded on the truck in California, and that coconspirator Bryan Eammon Williams assisted in loading the cocaine onto the truck and was to receive the shipment in Jessup, Maryland.  ECF 273, ¶ 17.  Agents also learned that Nyakana was to receive over $200,000 as payment for the transportation of the cocaine.  *Id*.

Nyakana and Williams were arrested on April 4, 2011. ECF 273, ¶ 17. Approximately $269,000 in U.S. currency was seized from the trunk of Williams's vehicle. *Id.* Telephone calls between Williams and Hayes indicated that Williams supplied cocaine to Hayes. *Id.*

Agents saw Plunkett enter Belvedere Towers on April 18, 2011, and then exit with a large bag. *Id.* ¶ 18. Plunkett entered his vehicle and drove to 301 W. 27th Street. When he exited the residence, Plunkett had a dark garbage bag and a small backpack in his hands. *Id.* He placed the garbage bag in the rear seat of his vehicle and drove to Belvedere Towers. *Id.* Plunkett entered the stash apartment, exited a few minutes later, drove his car to a dumpster at the building, and discarded the trash bag. *Id.* Agents retrieved the garbage bag from the dumpster. *Id.* They recovered paper towels, two boxes of baking soda, and several vacuum sealed bags that had been opened. *Id.* The bags tested positive for cocaine residue. *Id.*

Wilford was also observed in April and May 2011 at Seapines Circle in Baltimore County. *Id.* ¶ 19. On April 19, 2011, Wilford was observed leaving a residence located on Seapines Circle with a large duffel bag. *Id.* Wilford was followed to a bank, where he made a cash deposit. *Id.*

Agents observed a UPS truck in front of 1500 Cliftview Avenue on April 22, 2011. *Id.* ¶ 20. The UPS driver took a large cardboard box to the residence, but no one was there. *Id.* The box appeared to be the same size as the boxes exchanged previously between Wilford and Hayes. *Id.* The driver took the box back to the truck and waited. *Id.* Hawkins and Wilford then arrived in Hawkins's vehicle. The driver gave Hawkins the cardboard box, and Hawkins took it inside 1500 Cliftview Avenue. *Id.* A few minutes later, Wilford entered 1500 Cliftview Avenue. *Id.*

On April 27, 2011, agents observed another large box in the dumpster located at Belvedere Towers. *Id.* ¶ 21. The box was the same size as the boxes exchanged previously between Wilford

and Hayes.  ECF 273, ¶ 21.  The shipping label listed 35 Mainview Court in Reisterstown, Maryland as the recipient address.  As noted, the residence was owned by Derrick Barbour.  *Id*.

The federal indictment followed on May 5, 2011, charging defendant as well as Hayes, Plunkett, Williams, Nyakana, and Hawkins.  ECF 1.  Coconspirators Michael Smooth, Alvin Wells, Derrick Barbour, Richard Tates, Antoine Goodson, and Keith Hill were charged in the Circuit Court for Baltimore City.  ECF 273, ¶ 22 n.1. Several defendants were arrested during the week of May 16, 2011.  *Id*. ¶ 22.  At the time of their arrests, Hayes and Plunkett had 1.5 kilograms of crack cocaine in their possession.  ECF 273, ¶ 22.  A small amount of powder and crack cocaine was also seized from the stash apartment at Belvedere Towers.  *Id*.

Wilford's residence at 1500 Cliftview Avenue was searched on or about May 16, 2011. ECF 205 at 18.  A hollowed-out computer shell, a large cardboard box, and a mold for forming a kilogram of narcotics were seized.  ECF 273, ¶ 23.  The box was the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.

A shipment of cocaine sent to the Cliftview Avenue address was intercepted and seized on or about May 20, 2011.  It contained approximately eight kilograms of cocaine hydrochloride.  *Id*. ¶¶ 23, 28.  The cocaine was concealed inside of a hollow computer shell, and the shipping box was the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.

Plunkett's residence was also searched.  ECF 205 at 18.  And, $200,000 in U.S. currency was recovered, along with wrappers for kilograms of cocaine and other drug items.  *Id.*  At Hayes's residence, agents recovered $300,000 in U.S. currency.  *Id*.

Approximately $1.6 million dollars in U.S. currency was seized during a search of the residence at 3530 Seapines Circle in Reisterstown, Maryland.  ECF 273, ¶ 24.  Testimony at trial indicated that Wilford had a key to the residence and stored cash at that location.  *Id*.  The money

was found underneath a stairwell to the basement, in a manner government counsel described at sentencing as "hidden away pretty, pretty secretly."  ECF 369 (Tr. of Aug. 7, 2014) at 64.

Wilford's residence in Elkton was also searched and agents seized a small amount of currency, receipts for six UPS shipments to California, and materials for wrapping and shipping currency.  ECF 273, ¶ 25.  Testimony at trial indicated that the residence was sometimes used as a location to prepare large sums of U.S. currency for shipment to California.  *Id.*

UPS shipping records indicated that Wilford shipped at least 28 packages to California, using fake names.  *Id.*  UPS shipping records revealed that in 2010 and 2011, six shipments of cocaine were made to 35 Mainview Court in Reisterstown, Maryland, and eighteen shipments of cocaine were made to 1500 Cliftview Avenue, including the shipment intercepted on or about May 20, 2011.  *Id.* ¶¶ 23, 28.

As noted, Wilford was not arrested with the others in May 2011.  Instead, he fled to Los Angeles.  *Id.* ¶ 26.  In August 2011, a federal law enforcement agent attempted to arrest Wilford, but Wilford was able to avoid apprehension in his vehicle.  *Id.* ¶¶ 26, 35.  Investigation revealed that Wilford had rented an apartment in Los Angeles under a fake name.  *Id.* ¶ 26.  A search of that apartment and the vehicle led to the recovery of approximately $68,000 in U.S. currency and fake IDs.  *Id.* ¶ 26.

Wilford was finally arrested on September 16, 2011, at a "secret apartment" located on Laurel Avenue in Baltimore City.  *Id.* ¶ 27.  Approximately $189,000 in U.S. currency, 14 cell phones, and a fake ID were seized either from the apartment or defendant's vehicle.  *Id.*

Wilford maintained a dump truck business, RAW Enterprises.  *Id.* ¶¶ 32, 82.  Testimony at trial suggested that Wilford's business earned approximately $1.4 million in income over four years.  *Id.* ¶ 32; *see also* ECF 356.

In sum, "the evidence at trial established that Wilford was responsible for obtaining enormous quantities of cocaine from California for sale to the Hayes drug-trafficking organization." ECF 273, ¶ 33. The government claimed: "As evidenced by the huge amount of cash seized from Wilford during the investigation, he profited substantially from his drug-trafficking and received a larger share of the fruits of his drug-trafficking as compared to the other members of the Hayes drug-trafficking organization." *Id.* As the government described at sentencing, approximately $2 million in cash was seized from Wilford, as well as "$194,000 in watches and jewelry and high-end vehicles." ECF 369 at 139.

In February 2014, after trial, Wilford again wrote to the Court with complaints about Purpura. ECF 281. Based on this correspondence, the Court again referred the matter to a magistrate judge for an attorney inquiry hearing. ECF 283. That hearing was held on February 18, 2014. ECF 286.[9]

On February 17, 2014, Purpura moved to withdraw as Wilford's attorney. ECF 285. In his motion, Purpura noted that throughout his representation, Wilford had "repeatedly expressed his dissatisfaction and lack of trust in counsel," as reflected in his pro se motions and direct correspondence with the Court. *Id.* ¶ 2. Purpura also noted that throughout the proceedings, he visited Wilford, who was detained, on numerous occasions; retained another attorney and two law clerks to respond to Wilford's concerns and to conduct research; filed numerous motions and briefs; met with Wilford prior to filing and arguing the motions; and worked extensively with Wilford at trial. *Id.* ¶¶ 4, 6, 8. He also asserted that, prior to trial, he engaged in plea negotiations with the government and obtained a plea offer that "could have resulted in a favorable sentence

---

[9] The hearing was conducted by then Magistrate Judge Stephanie Gallagher. She now serves on this Court as a District Court judge.

and the return of certain specified assets." ECF 285, ¶ 5.  Wilford was aware that conviction at trial would lead to a mandatory minimum sentence of twenty years with a maximum potential sentence of life imprisonment.  *Id.*  Nevertheless, "Mr. Wilford followed his own advice, declined the government's offer and demanded full litigation of all legal issues and a trial."  *Id.* ¶ 5.

Purpura concluded: "Counsel is confident that Mr. Wilford received exceptionally competent and complete legal representation in every aspect of this litigation. Nevertheless . . . Counsel has done all that he can do for this defendant and, therefore, for the first time in 35 years of practice, counsel has been placed in a position where counsel has no ethical choice but to request the Court to relieve counsel from further representing Mr. Wilford."  *Id.* ¶ 11.

Judge Gallagher granted the motion to withdraw.  ECF 287.  Thereafter, Jenifer Wicks was appointed to represent Wilford for sentencing.  ECF 293; ECF 297.

Prior to sentencing, Wilford filed a pro se "Motion to Vacate Verdict and for a New Trial." ECF 329.  He argued, *inter alia*, that the verdict should be vacated because he was denied his right to an arraignment.  *Id.* at 3-4.  Defense counsel also filed a "Notice of Preliminary Issues Related to Sentencing and Forfeiture Proceeding" (ECF 339), in which counsel indicated that defendant intended to raise, *inter alia*, the lack of an arraignment.  *Id.* ¶ 1.  Both sides filed various submissions in relation to forfeiture.  *See, e.g.*, ECF 316; ECF 321; ECF 328.

Then, on July 2, 2014, Wicks moved to withdraw as Wilford's counsel, at defendant's request.  ECF 320; *see also* ECF 323 (letter from Wilford).  Counsel cited miscommunications and disagreements with Wilford.  ECF 320, ¶¶ 3-5.  The Court referred the matter to a magistrate judge for an attorney inquiry hearing.  ECF 322.  That hearing was held by Judge Gallagher on July 18, 2014.  ECF 325.  She denied the motion to withdraw.  ECF 327.

Under § 2D1.1(c)(1) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the PSR calculated Wilford's base offense level at 38, based on the quantity of drugs involved. ECF 273, ¶ 37. Two levels were added, pursuant to U.S.S.G. § 2D1.1(b)(12), because defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance. *Id.* ¶ 38. Under U.S.S.G. § 2D1.1(b)(14), the PSR added another two levels because defendant used friendship to involve another individual, Mark Hawkins, in the illegal purchase, sale, transport, or storage of controlled substances. *Id.* ¶ 39. And, under U.S.S.G. § 3B1.1(a), the PSR added four levels because defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. ECF 273, ¶ 41. And, in regard to the August 2011 arrest attempt in Los Angeles, and pursuant to U.S.S.G. § 3C1.2, the PSR added two levels because defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement. *Id.* ¶ 42.

Therefore, according to the PSR, Wilford had an adjusted offense level of 48. *Id.* ¶ 44. However, because the maximum offense level under the Guidelines is 43, per Chapter 5, Part A, Application Note 2, defendant had a final offense level of 43. *Id.* ¶ 45. The PSR also determined that Wilford qualified as a career offender under U.S.S.G. § 4B1.1, based on his two prior federal convictions. *Id.* ¶ 46. The offense level based on the career offender designation would be 37, but because the adjusted offense level of 43 exceeds 37, the offense level of 43 applied instead. *Id.*

The PSR reflected three adult criminal convictions. *Id.* ¶¶ 49-53. In 1992, Wilford pled guilty in federal court to conspiracy to distribute cocaine, and was sentenced to 60 months of incarceration and five years of supervised release. *Id.* ¶ 49; *see* case JFM-92-116. In 2001, defendant was charged with distribution of heroin. *See* case MJG-01-399. Wilford pleaded guilty. ECF 273, ¶ 50. And, he was sentenced in 2003 to 24 months of incarceration, followed by four

years of supervised release.  ECF 273, ¶ 50.  In 2011 defendant pled guilty in the Circuit Court for Baltimore County to conspiracy to possess with intent to distribute.  *Id.* ¶ 53.  He was sentenced to unsupervised probation.  *Id.*

These convictions resulted in a subtotal of seven points.  *Id.* ¶ 54.  However, at the time of the instant offense, Wilford was on supervised release for the distribution of heroin conviction, and so two points were added.  *Id.* ¶ 55.  This yielded a total of nine criminal history points, which equates to a criminal history category of IV.  *Id.* ¶ 56.  But, as mentioned, Wilford was found to be a career offender.  As a result, he had a criminal history category of VI, under U.S.S.G. § 4B1.1.  *Id.* ¶ 57.[10]

Based on a total offense level of 43 and a criminal history category of VI, the Guidelines called for a sentence of life imprisonment.  *Id.* ¶ 66.  The PSR noted that Wilford's offense carried a mandatory minimum term of imprisonment of 20 years, pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851.  ECF 273, ¶ 65.[11]

At the time of sentencing, Wilford was 41 years old.  *Id.* at 1.  Defendant is 5'9" tall and, at sentencing, weighed approximately 190 pounds.  *Id.* ¶ 78.  He advised that he was in good health, but suffered from high blood pressure.  *Id.*  He described himself as an alcoholic who began drinking heavily in his late thirties.  *Id.* ¶ 79.  He also reported that he began using marijuana as a teenager and "tried cocaine a couple of times in his twenties."  *Id.* ¶ 80. The PSR noted that in the

---

[10] As discussed, *infra*, if Wilford were sentenced today, he would not have qualified as a career offender because conspiracy is not a qualifying offense or predicate. *See United States v. Norman*, 935 F.3d 232, 238-39 (4th Cir. 2019).

[11] If defendant had an offense level of 37 and a criminal history category of IV, his Guidelines would have been 292 to 365 months of imprisonment.  An offense level of 40, with a criminal history category of IV, yields Guidelines of 360 months to life.  And, an offense level of 43 and a criminal history category of IV would yield Guidelines of life imprisonment.

earlier PSR, prepared with regard to defendant's 2001 federal case, he had admitted to using one gram of heroin per week, beginning in 1997.  ECF 273, ¶ 80.

Wilford completed his GED while previously incarcerated.  *Id*. ¶ 81.  As of sentencing, he had one child with his girlfriend, and two children from prior relationships.  *Id*. ¶ 74.  He described his childhood as "traumatic," primarily because of substance abuse and domestic violence issues involving his parents and other family members.  ECF 273, ¶ 73.

Sentencing and forfeiture proceedings were held on August 7, 2014, and August 12, 2014.  ECF 352; ECF 353; ECF 368.  At the hearing on August 7, 2014, the issue concerning the lack of an arraignment was discussed.  *See* ECF 369 (Tr. of Aug. 7, 2014) at 15-17, 22-28, 32, 72-74.  The government acknowledged that Wilford had not been formally arraigned.  *Id*. at 73.  For his part, Wilford acknowledged that he had not written to the Court regarding a failure to arraign, but stated that he had not confirmed that he was not arraigned until after trial, at which point he brought the issue to Purpura's attention, who said that he had been arraigned.  *Id*. at 28.  Wilford also asserted that because he was not arraigned, he had not been able to advance a Speedy Trial Act argument, and was prejudiced because of issues relating to witness availability and memory.  ECF 369 at 23.  I commented, *id*. at 26-27: "It's hard for me to see how you could have been prejudiced by, given the life of this case, if you weren't arraigned . . . I'm hard-pressed to understand, after so many years of living with this case, how you didn't know what you needed to know and how the law would say you could remain silent about it until after the trial and complain that you didn't get one."  I also ruled that, in my view, there were no grounds presented in ECF 329 for a new trial.  *Id*. at 22.

The government sought a sentence of 360 months of incarceration.  *See* ECF 284 at 1.  Defense counsel sought the mandatory minimum term of 240 months (20 years), and lodged

several objections to the PSR.  ECF 275; ECF 336.  Therefore, I was called on to resolve various disputes and objections.  *See* ECF 355 (Statement of Reasons); ECF 369 (Tr. of Aug. 7, 2014) at 75-116; ECF 370 (Tr. of Aug. 12, 2014) at 28-29.

In particular, I found that a base offense level of 36, rather than 38, was appropriate, based on the drug quantity.  ECF 355 at 1.  I also applied a two-level reduction in the offense level based on then-forthcoming changes in the drug quantity table.  ECF 369 at 76-78.  Further, I rejected the proposed two-level upward adjustment for Wilford's use of his friendship with Hawkins under U.S.S.G. § 2D1.1(b)(14), finding that it was duplicative of the adjustment under U.S.S.G. § 3B1.1(a).  ECF 369 at 116.  And, I rejected the two-level upward adjustment under U.S.S.G. § 3C1.2, because I was not satisfied that defendant intended to endanger the law enforcement officer in question.  ECF 369 at 122-24.  With these determinations, I found that Wilford had a final offense level of 40, not 43, and a criminal history score of VI.  This resulted in a Guidelines range of 360 months of imprisonment to life imprisonment.  ECF 355 at 1.

In my remarks at sentencing, I described the government's recommendation of 360 months of imprisonment as "very reasonable," and noted that defendant "earned" the career offender designation.  ECF 369 at 177-78.  I commented that Wilford was "a source of an enormous quantity of drugs worth an enormous amount of money," and the scheme involved a "huge enterprise," in which defendant was "towards the very top."  *Id*. at 173.  I also remarked that the goal of deterrence would "justify a very significant sentence."  *Id* at 173-74.

In addition, I noted that the Guidelines range was largely unaffected by the various changes that could be made to defendant's offense level based on drug quantity or career offender designation.  *Id*. at 174-75. And, in response to comments by Wilford (*see id*. at 163-67) that he was not able to plead guilty, I said: "I have very little knowledge about any of what you're saying,

other than to say there was not any indication to me that you wished to plead guilty and were being, as you say, forced to go to trial."  ECF 369 at 172.

Ultimately, I sentenced Wilford to a below Guidelines sentence of 340 months of imprisonment, with credit for time served in federal custody since September 16, 2011, along with ten years of supervised release.  ECF 354 (Judgment) at 2-3.  In a "Revised Amended Order of Forfeiture," I determined that approximately $3,808,000 constituted proceeds dervided directly or indirectly from the offense, and forfeited defendant's interest in various substitute assets.  ECF 356.[12]

In the Statement of Reasons (ECF 355), I wrote: "This was a large-scale drug conspiracy and the defendant played a central role. . . . The defendant is very intelligent and, to his credit, is not associated with any violence.  All co-defendants pleaded guilty and no one received more than 180 months' incarceration."  *Id.* at 3.

Wilford appealed to the Fourth Circuit.  ECF 357.[13]  During the pendency of the appeal, he continued to file a steady stream of pro se motions, letters, and other submissions.  *See* Docket.  In particular, he filed a "Motion to Dismiss or Vacate for Lack of Jurisdiction . . .," in which he argued that the Court was without jurisdiction to try him because he was never arraigned, and thus never afforded an opportunity to enter a plea.  ECF 416.  He also filed a "Motion for New Trial Based On Newly Discovered Evidence," asserting several grounds for a new trial under Fed. R. Crim. P. 33.  ECF 418.  On the unopposed motion of the government, the Fourth Circuit held

---

[12] I initially issued a forfeiture order in the amount of $5 million. ECF 346. Upon further reflection, and after the hearing of August 12, 2014, I modified the relevant drug quantity, which resulted in the revised order. *See* ECF 350; ECF 352; ECF 356; ECF 370.

[13] Wilford had several attorneys on appeal during this period, as discussed, *infra*.

Wilford's appeal in abeyance pending this Court's disposition of ECF 416 and ECF 418.  ECF 424.

By Memorandum (ECF 445) and Order (ECF 446) of February 26, 2016, I denied both ECF 416 and ECF 418.  As to Wilford's arraignment and plea claim, I extensively reviewed the pretrial proceedings in this case.  ECF 445 at 2-12.  I concluded that it was clear that, at Wilford's initial appearance, he was provided a copy of the charging instrument, and the nature of the charge was explained to him.  *Id.* at 8.  I acknowledged that defendant was not asked how he wished to plead, and a formal arraignment was never held.  *Id.*  "From a review of the record, however, I [could not] discern any prejudice to the defendant from the fact that he was not arraigned."  *Id.*  As the record reflects, Wilford vigorously contested the charge against him, and never voiced any complaints as to a lack of opportunity to enter a plea.  Furthermore, I noted that "a defendant who knowingly proceeds to trial despite the lack of a formal arraignment is deemed to have waived his right to such a proceeding."  *Id.* at 9 (citing *Garland v. State of Washington*, 232 U.S. 642 (1914), and other cases).  Nor was I persuaded by any of Wilford's arguments in ECF 418.  *See* ECF 445 at 12-22.  Wilford appealed this ruling to the Fourth Circuit.  ECF 459.

The Fourth Circuit affirmed this Court in a decision of May 9, 2017.  ECF 509; *see United States v. Wilford*, 689 Fed. App'x 727 (4th Cir. 2017) (per curiam).[14]  The Court concluded that Wilford's arguments were without merit, including as to the failure to arraign; prosecutorial misconduct; the Court's suppression rulings; and its jury instruction rulings.  *Wilford*, 689 Fed. App'x at 728-32.  In particular, regarding the arraignment issue, the Fourth Circuit said, *id*. at 729:

> Wilford first argues that this court lacks jurisdiction over him because the district court never arraigned him. Rule 10 of the Federal Rules of Criminal Procedure requires that a defendant be advised in open court of "the substance of the charge" before being called upon to plead. However, technical noncompliance

---

[14] The Fourth Circuit consolidated Wilford's two appeals. *See* ECF 500.

with the procedural requirements of the rule does not warrant a reversal of a conviction if not raised before trial. *See United States v. Reynolds*, 781 F.2d 135, 136 n.2 (8th Cir. 1986). "A failure to arraign only warrants a reversal if it causes prejudice or impairs a substantial right." *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998).

Although Wilford was never formally arraigned, he was properly advised of the charges at his initial appearance. Furthermore, Wilford's attorney received a copy of the superseding indictment and filed numerous pretrial motions. Wilford never raised the lack of an arraignment in the district court. Consequently, we conclude that Wilford has failed to establish either prejudice or the impairment of a substantial right. Moreover, Wilford waived any argument pursuant to the Speedy Trial Act, 18 U.S.C. § 3161 (2012), because he did not raise this issue prior to trial in the district court. "[T]he plain language of Section 3162(a)(2) is unequivocal in requiring that a defendant move for dismissal of an indictment before the beginning of a new trial or suffer a statutorily imposed waiver of rights under the Act." *United States v. Mosteller*, 741 F.3d 503, 509 (4th Cir. 2014).

The Fourth Circuit denied Wilford's petition to rehear the case en banc. ECF 503. His petition to the Supreme Court for a writ of certiorari was also denied. *See* Docket, 7/02/2018.

In August 2017, Wilford filed a "Memorandum and Motion to Dismiss for Lack of Subject-Matter Jurisdiction Pursuant to the Court's Inherent Supervisory Power and Not to Be Construed as 28 U.S.C. § 2255." ECF 507. By Memorandum (ECF 525) and Order (ECF 526) of May 4, 2018, I noted that Wilford's arguments in ECF 507 were essentially identical to those he advanced in ECF 416. Therefore, I denied ECF 507 for the reasons expressed in my opinion at ECF 445, as well as the Fourth Circuit's opinion in *Wilford*. ECF 525 at 4.

Wilford is currently serving his sentence at FCI Victorville Medium I. *See* ECF 663 at 1; *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited June 15, 2022). He has a projected release date of November 7, 2035. ECF 629-1 at 3. With credit for pretrial detention, dating to September 16, 2011, Wilford has served about 129 months of his 340-month sentence, or approximately 40%.

### B. Petition and Motion

Wilford has filed numerous motions and other submissions, advancing a variety of arguments.

In April 2019, Christopher Nieto was appointed to represent Wilford in connection with the § 2255 Petition. ECF 540; ECF 543. Counsel filed the Petition in June 2019. ECF 546. It contains 59 claims of ineffective assistance of counsel and prosecutorial misconduct, none of them accompanied by more than a few sentences of argument. *Id.* Simultaneously with ECF 546, counsel filed a motion to hold ECF 546 in abeyance until counsel could investigate the claims and supplement the filing. ECF 547. The Court granted this motion. ECF 548.

In February 2020, Wilford submitted a pro se "Letter to the Court," asserting various deficiencies in the proceedings against him. ECF 562.[15] And, in March 2020, before the Petition had been supplemented, Nieto moved to withdraw as Wilford's attorney. ECF 564. Nieto cited a "breakdown in communication and trust between counsel and client," and disagreement over the proper course of the § 2255 investigation. ECF 564, ¶¶ 3-4. The Court granted this motion. ECF 565. The following month, Mary E. Davis was appointed as Wilford's lawyer. ECF 572.

In February 2021, Wilford filed a pro se supplement to the Petition. ECF 615 (the "First Supplement"). It was accompanied by an Affidavit from Wilford. ECF 615-1. In ECF 615, Wilford lodges about 65 claims, some of which are related, but generally without citation to the record.

---

[15] Although ECF 562 was docketed as a supplement to the Petition, and concerns similar subject matter, it does not appear from its content that this submission was intended to be part of the Petition.

The government responded in March 2021.  ECF 640 (the "First Opposition").[16]  And, Wilford filed a pro se reply (ECF 650, the "First Reply"), supported by exhibits.  ECF 650-1 to ECF 650-12.

Then, in August 2021, Davis moved to withdraw as Wilford's counsel.  ECF 651.  Like Nieto, Davis cited "a complete breakdown in communication between counsel and client," noting Wilford's repeated pro se filings.  *Id.* ¶ 2.  The Court granted the motion.  ECF 652.

Brent Newton was then appointed for Wilford.  ECF 654.  He filed a supplement to the Petition in November 2021.  ECF 659 (the "Second Supplement").  It is supported by a Declaration by Wilford.  ECF 661-1.[17]  As discussed below, the Second Supplement appears to narrow Wilford's Petition to what it describes (*id*. at 2) as three "ineffective-assistance-of-counsel claims:" the failure to arraign and the consequences of this failure under the Speedy Trial Act; alleged poor advice by trial counsel relating to Wilford's pretrial motions; and an asserted failure to provide counsel to Wilford during his appeal.  ECF 661 at 3-18.

At the Court's direction (ECF 670), the government responded to the Second  Supplement. ECF 673 (the "Second Opposition").  The Second Opposition is supported by three exhibits.  ECF 673-1 to ECF 673-3.  And, Wilford, through counsel, has replied.  ECF 674 (the "Second Reply"). Defense counsel has also submitted a notification of supplemental authority.  ECF 675.

As for the Motion, Wilford is self-represented.  He first moved for compassionate release in November 2020 (ECF 595), supported by several exhibits.  ECF 595-1 to ECF 595-3.  He has since supplemented the Motion five times, most recently in January 2022.  ECF 602; ECF 606;

---

[16] In November 2020, the Court initially directed the government to respond.  ECF 597. The government requested several extensions.  *See* ECF 604; ECF 632.

[17] An initial version of Wilford's Declaration is docketed at ECF 660-1.  ECF 661-1 is a corrected version.

ECF 622; ECF 629; ECF 635; ECF 663.  In addition, he has written several letters to the Court and provided a medical record.  *See, e.g.*, ECF 664; ECF 665; ECF 669.  And, the Court has received letters from family members and friends, including other incarcerated people, in support of Wilford's release.  *See, e.g.*, ECF 569; ECF 634; ECF 638; ECF 646.

Wilford asserts that he is vulnerable to COVID-19 as a result of hyperlipidemia; hypothyroidism; hypertension; heart disease; and obesity.  He also notes that he contracted COVID in January 2021.  *See, e.g.*, ECF 595-2; ECF 606 at 1; ECF 606-1; ECF 629 at 30-35.  He declined the COVID-19 vaccine in February 2021.  ECF 665 at 1.  However, he explains that this was because he had tested positive for COVID-19 three weeks prior.  ECF 664.  In any event, the medical records reflect that defendant received two doses of the Moderna COVID-19 vaccine, one in May 2021 and the other in June 2021.  ECF 665 at 2.

Wilford submitted an administrative request for compassionate release while at FCI McKean in May 2020 (ECF 629-2), which was denied by the Warden in June 2020.  ECF 629-3. In August 2020, Wilford submitted a second administrative request (ECF 629-4), which was also denied by the Warden.  ECF 629-5.  The government does not contest that Wilford has satisfied his administrative exhaustion requirements under the compassionate release statute.  *See* ECF 629 at 23-24.

Defendant represents that, if released, he will reside with a "childhood friend" in Lutherville, Maryland.  ECF 635 at 7; *see also* ECF 595 at 28-29.  And, he states that he has "a job available upon arrival at L&J Waste."  ECF 635 at 7.[18]

---

[18] In his May and August 2020 administrative compassionate release requests, Wilford asserted that, if released, he would reside in Long Beach, California, and assist with a family cleaning business. *See* ECF 629-2 at 1, 3. However, his Motion does not refer to this release plan.

BOP records reflect that defendant has received a handful of incident reports for disciplinary infractions, all in 2019.  ECF 595-1 at 4.  These reports were for being insolent to a staff member, refusing to obey an order, and possessing an unauthorized item.  *Id.*

The government opposes the Motion.  ECF 629 (the "Motion Opposition").  The Motion Opposition is supported by several exhibits.  ECF 629-1 to ECF 629-7.  Wilford has never formally replied to the Motion Opposition.  But, his fourth (ECF 635) and fifth (ECF 663) supplements to the Motion were submitted after the filing of the Motion Opposition.   In ECF 635, Wilford specifically asks the Court not to construe his supplement as a reply.  ECF 635-1 at 1.  But, in ECF 663, Wilford refers to ECF 635 as a "Response to the Government's Response in Opposition." ECF 663 at 1.

As mentioned, Wilford has submitted a variety of other motions and filings that await disposition.  These include a motion to reconsider (ECF 528) the Court's previous denial (ECF 525; ECF 526) of Wilford's motion to dismiss the judgment against him (ECF 507); a motion for leave to file a supplement ECF 528 (ECF 533); a "Request to Take Judicial Notice" (ECF 535); a motion for a hearing (ECF 536) regarding ECF 528; a "Motion to Correct Clerical Error" (ECF 557); a motion to compel Purpura to surrender his file to Wilford (ECF 566); a "Motion to Compel Judgment" regarding ECF 528 (ECF 570); a letter entitled "Gross Misconduct Through Unfair and Oppressive Acts by Federal Law Enforcement Officials in Their Course of Duties" (ECF 616); and a motion for discovery in connection with the Petition.  ECF 656.

## II. The Post Conviction Petition

### A. Standard of Review

#### 1.

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal

custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'"  *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Under § 2255, the Petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid.  *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). And, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting Hill, 368 U.S. at 428).

The scope of collateral attack under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'"  *Foster v. Chatman*, 578 U.S. 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)).  A failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains" or "actual innocence."  *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S.

339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.' "); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 509 (2003). Ordinarily, such claims are not litigated on direct appeal. Claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *see also United States v. Ladson*, 793 Fed. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam). Generally, such claims are litigated in a § 2255 action, to allow for development of the record. *Massaro*, 538 U.S. at 504-06; *Ladson*, 793 Fed. App'x at 203.

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief. . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). Generally, a district court has discretion as to whether to hold a hearing, but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim[.]" *Mayhew*, 995 F.3d at 176-77. If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021) (same).

29

In my view, no hearing is warranted here. The Petition and related filings conclusively show that Wilford is not entitled to relief.

**2.**

Wilford asserts claims of ineffective assistance of trial counsel. The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, \_\_\_\_ U.S. \_\_\_\_, 137 S. Ct. 759, 775 (2017). Ineffective assistance of counsel is a well recognized basis for relief under § 2255. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler*, 566 U.S. 156; *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *Akande*, 956 F.3d at 260; *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013).

The petitioner must prove his claim by a preponderance of the evidence. *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010); *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

The first *Strickland* prong, also known as the "performance prong," relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). And, "the *Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, because "the standard of judging counsel's representation is a most deferential one." *Id.* Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of

31

reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Notably, a claim of ineffective assistance is evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation." *Palacios*, 982 F.3d at 924; *see Carthorne*, 878 F.3d at 466. Thus, "[t]o avoid the distorting effects of hindsight, claims under *Strickland's* performance prong are 'evaluated in light of the available authority'" at the relevant time. *United States v. Morris*, 917 F.3d 818, 823 (4th Cir 2019) (citation omitted). To be sure, counsel "are obliged to make [] argument[s] that [are] sufficiently foreshadowed in existing case law," but counsel is not deficient "for failing to predict" changes in the law. *Id.* at 824 (alterations in *Morris*; internal quotation marks omitted).

Under the second *Strickland* prong, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at

697.  Nor must a court address both components if one is dispositive.  *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim.  As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### B. Discussion

As discussed, Wilford's former lawyer filed the original placeholder Petition in June 2019, with 59 claims of ineffective assistance of counsel and prosecutorial misconduct.  ECF 546.  In counsel's motion to hold the Petition in abeyance (ECF 547), counsel explained: "Once counsel has had sufficient time to review and investigate, he will amend or supplement his filing.  As part of this process, counsel will likely narrow the issues to those that are provable and material to the case." *Id.* at 2.  However, neither that lawyer nor his replacement counsel filed a supplement before withdrawing from the case.

Wilford, pro se, filed the First Supplement in February 2021. *See* ECF 615.  It contains about 65 claims, grouped into categories: the Court lacked jurisdiction; ineffective assistance of counsel; prosecutorial misconduct; and "significant judicial errors."  Some of the claims are related, and some overlap with those asserted in ECF 546.

The claims in ECF 546 and ECF 615 are no more than a few sentences long, without citation to the record.  "'[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.'"  *United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000)).

At the Court's direction (ECF 597), the government responded to the Petition.  ECF 640. Although the First Opposition was filed after the First Supplement, it appears to respond solely to ECF 546.  And, it does so only in a general way, labeling defendant's claims as conclusory and,

in some cases, foreclosed because they were disposed of on direct appeal or, conversely, not raised on direct appeal.  ECF 546 at 12-17.  Wilford replied.  ECF 650.

Wilford's current counsel filed the Second Supplement in November 2021.  ECF 659. According to the Second Supplement, "Mr. Wilford requests an evidentiary hearing on three of the ineffective-assistance-of-counsel claims set forth in his pending section 2255 motion."  ECF 659 at 2; *see also id.* at 19 (same); *Mayhew*, 995 F.3d at 176 (a district court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief. . . .").  These three claims are: trial counsel was ineffective for failing to raise Wilford's lack of arraignment, and failing to thereafter move for dismissal under the Speedy Trial Act; trial counsel was ineffective for erroneously advising Wilford that his suppression motions had any chance of success, which caused defendant to reject the government's plea offers; and the Fourth Circuit committed a structural error when it violated Wilford's right to counsel by improperly permitting him to proceed pro se for a portion of the appeal.  ECF 659 at 3-18.[19]

The Second Supplement narrows the claims advanced in Wilford's Petition.  *Cf.* ECF 547 at 2 (noting that, once the Petition is amended and supplemented, "counsel will likely narrow the issues to those that are provable and material to the case").  And, the Second Supplement has been fully briefed.  ECF 673 (Second Opposition); ECF 674 (Second Reply).  Therefore, I thus proceed to consider the three contentions.

---

[19] The Second Supplement characterizes the third claim as an "ineffective-assistance-of-counsel" claim. ECF 659 at 2, 19. But, the crux of the argument is that Wilford was denied counsel entirely. The Second Supplement also describes the lack of counsel as a "'structural error.'"  ECF 659 at 18.

## 1. Failure to Arraign and Speedy Trial Act

### i.

The first argument centers on Wilford's lack of an arraignment.  ECF 659 at 3-10.  Wilford argues that defense counsel was ineffective for failing to call the Court's attention to the fact that he was not arraigned.  In particular, the Petition contends that had counsel done so, the Court would have been required to dismiss the Indictment under the Speedy Trial Act.

As an initial matter, I note that the government argued in the First Opposition that the Fourth Circuit already addressed this issue on direct appeal.  *See* ECF 640 at 14-15.  The government does not reassert this position in the Second Opposition, and properly so.  The Fourth Circuit considered whether the failure to arraign Wilford deprived the Court of jurisdiction or warranted reversal of Wilford's conviction, and concluded that it did not.  *See Wilford*, 689 Fed. App'x at 729.  However, it did not consider this issue in the context of an ineffective assistance of counsel claim.  Although the Fourth Circuit's decision is certainly relevant, it did not dispose of the claim made in the Second Supplement.  Thus, I consider this issue on the merits.

As described above, Wilford appeared before Magistrate Judge Beth Gesner for an initial appearance on September 16, 2011, represented by Purpura.  ECF 64; ECF 291.  At that hearing, defense counsel advised the court that the defendant had received a copy of the Indictment.  ECF 291 at 3.  Judge Gesner then proceeded to advise Wilford that he had been charged in a Superseding Indictment with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846; the maximum possible penalty, if convicted; the mandatory minimum penalty, if convicted; and the forfeiture count.  *Id*. at 3-4.  The defendant expressly indicated that he understood the charge and the maximum possible penalty.  *Id.* at 4.  Thereafter, Judge Gesner advised the defendant of his rights.

The defendant was sworn and, under oath, he indicated that he understood "everything so far[.]" ECF 291 at 5.

At the end of the proceeding, Judge Gesner asked: "[D]o you want to do an arraignment while you are here?"  *Id.* at 7.  The defense attorney responded: "I would ask not for this -- for a lot of reasons, but no."  *Id.*

It is undisputed (*see* ECF 673 at 14) that no arraignment was ever held.  Moreover, neither defense counsel nor the government called the Court's attention to this issue prior to trial.

Even assuming that Purpura rendered deficient performance for failing to assure that defendant was arraigned, defendant cannot prevail on the ineffective assistance claim.  This is because defendant cannot show that he suffered prejudice from counsel's performance in this regard, whether under the Speedy Trial Act or otherwise.

Rule 10 of the Federal Rules of Criminal Procedure is titled "Arraignment."  Rule 10(a) provides: "An arraignment must be conducted in open court and must consist of: (1) insuring that the defendant has a copy of the indictment or information; (2) reading the indictment or information to the defendant or stating to the defendant the substance of the charge; and (3) asking the defendant to plead to the indictment or information."

The Advisory Committee Notes to the 2002 Amendment of Fed. R. Crim. P. 10 refer to the arraignment as "an important element of the judicial process."  However, Advisory Committee Note 3 to Fed. R. Crim. P. 10 states: "Failure to comply with arraignment requirements has been held not to be jurisdictional, but a mere technical irregularity, not warranting a reversal of a conviction, if not raised before trial."  The Note cites *Garland*, 232 U.S. 614, which held that the failure to arraign the defendant was not an error of constitutional proportion, and that a defendant who knowingly proceeds to trial despite the lack of a formal arraignment is deemed to have waived

36

his right to such a proceeding.  *See also United States v. Solomon*, 581 Fed. Appx. 270, 273 (4th

Cir. 2014) ("[T]echnical noncompliance with the procedural requirements of [Rule 10] does not

warrant reversal of a conviction if not raised before trial.") (citing *United States v. Reynolds*, 731

F.2d 135, 136 n.2 (8th Cir. 1986)); *United States v. Williams*, 152 F.3d 294 (4th Cir. 1998) ("A

failure to arraign only warrants a reversal if it causes prejudice or impairs a substantial right.")

(citing *Garland*, 232 U.S at 644).

For its part, Fed. R. Crim. P. 11 is titled "Pleas." Rule 11(a) provides: "A defendant may

plead not guilty, guilty, or (with the court's consent) nolo contendere."  Rule 11(h) is titled

"Harmless Error."  It states: "A variance from the requirements of this rule is harmless error if it

does not affect substantial rights."

As discussed at length in my Memorandum Opinion of February 26, 2016 (ECF 445), it is

evident that, as a general matter, Wilford suffered no prejudice from the failure to hold a proper

arraignment.  At Wilford's initial appearance, defendant received a copy of the Indictment, and

was informed of the substance of the charge against him and the penalty.  *See* ECF 294 at 3-5.

Thus, the first two elements of an arraignment were satisfied.  However, Wilford was not asked to

enter a formal plea to the charge.

Following the initial appearance, defendant vigorously contested the charge, as recounted

above.  Many defense motions were filed, resulting in several days of motion hearings and two

written opinions.  *See* ECF 205; ECF 252.  There was substantial communication between defense

counsel, defendant himself, and the Court.  And, as defendant admits, there were some plea

discussions between the government and the defense.  *See* ECF 661-1 (Wilford Decl.).  Putting to

one side the Speedy Trial Act issue, which is discussed below, there is no indication that the failure

of defendant to formally enter a plea affected the proceedings in any way, or that any failure on

defendant's part to plead guilty was due to this lack of a formal arraignment. Moreover, at the outset of trial, the lawyers confirmed, under "*Lafler*," that Wilford had rejected the government's plea offer. Although defense counsel had made an eleventh hour plea proposal, which the government rejected, there was no indication that defendant was seeking to enter a guilty plea, but was unable to do so. *See* ECF 308 at 15. In other words, he elected to proceed to trial.

In short, as I concluded in my Memorandum Opinion of February 26, 2016, "The lack of formal arraignment as to the Superseding Indictment did not prejudice Wilford or affect his substantial rights in any way." ECF 445 at 12. And, this conclusion was affirmed on appeal by the Fourth Circuit, which said: "Although Wilford was never formally arraigned, he was properly advised of the charges at his initial appearance. Furthermore, Wilford's attorney received a copy of the superseding indictment and filed numerous pretrial motions. Wilford never raised the lack of an arraignment in the district court. Consequently, we conclude that Wilford has failed to establish either prejudice or the impairment of a substantial right." *Wilford*, 689 Fed. App'x at 729.

### ii.

The Second Supplement grounds its entire argument as to prejudice in the Speedy Trial Act. Specifically, defendant argues that the requirements of the Speedy Trial Act were violated. Thus, he contends that if an arraignment had been held, the Indictment would have been dismissed under the Speedy Trial Act, either on defendant's motion or sua sponte. ECF 659 at 5. The Second Supplement asserts that this constitutes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Speedy Trial Act generally requires that trial begin within 70 days from the later of a defendant's indictment or appearance.  18 U.S.C. § 3161(c).  If a defendant is not brought to trial within the required time limit, "the information or indictment shall be dismissed on motion of the defendant."  18 U.S.C. § 3162(a)(2).  However, there are many reasons for which time may be excluded from this computation.  *See* 18 U.S.C. § 3161(h).

Defendant and the government vigorously contest whether a violation of the Speedy Trial Act actually occurred in Wilford's case.  In the Second Supplement, Wilford asserts that a violation occurred because, by the December 2013 trial, "well over 70 days had passed since the grand jury's return of the superseding indictment and Mr. Wilford's subsequent arrest and initial appearance on September 16, 2011."  ECF 659 at 5.

The government responds, first and foremost, by noting the consent Order to exclude time pursuant to the Speedy Trial Act that was entered by the Court on August 8, 2011, before Wilford had been arrested or made his initial appearance.  ECF 58.  The Order excluded time under the Speedy Trial Act "for the period from the first initial appearance in the case (May 17, 2011) through to the final trial date to be set in this case."  *Id*. at 2.  The Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A), permits such an exclusion "on the basis of [the Court's] findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."

"No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial."  *Id*.  The Order here described the "unusual and complex" nature of the case,

including extensive discovery, multiple defendants, ongoing plea negotiations, and the need for pretrial preparation, and concluded that exclusion was "in the interest of the defendants and the interests of the public." ECF 58 at 2.  In noting the unusual and complex nature of the case, the Order explicitly cited to 18 U.S.C. § 3161(h)(7)(B)(ii), which specifies that the existence of an unusual and complex case is a factor that a court may consider in excluding time under the Speedy Trial Act.  ECF 58 at 2.

In the alternative, the government notes that Nyakana was the last of the defendants to have an initial appearance, which occurred on June 4, 2012.  *See* ECF 114 (Nyakana initial appearance).[20]  And, the speedy trial clock did not start to run until the day after the initial appearance of the last codefendant.  *See* 18 U.S.C. § 3161(h)(6) (excluding "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."); *United States v. Jarrell*, 147 F.3d 315, 316 (4th Cir. 1998) (stating "time excludable for one defendant is excludable for all defendants"); *United States v. Stoudenmire*, 74 F.3d 60, 63 (4th Cir. 1996) (holding that the speedy trial clock starts the day after "the day of the event that triggers the [Speedy Trial Act] clock"); *see also Henderson v. United States*, 476 U.S. 321, 323, 323 n.2, 331 (1986) (holding Speedy Trial Act clock began to run from the date of final codefendant's arraignment).  Thus, the government claims that, even without the Speedy Trial Act Order, the clock would not have begun until June 4, 2012. ECF 673 at 19.

By that point, Wilford had already filed several pretrial motions, some of which remained pending.  *See* ECF 92; ECF 160; ECF 197.  The Court did not rule on all of Wilford's motions

---

[20] This delay ensued because Nyakana fled to Uganda, where he was subsequently apprehended by federal agents and transported back to the United States. *See* ECF 673 at 16 n.3.

until November 27, 2013.  *See* ECF 252; ECF 253.  Trial ultimately began on December 11, 2013, 13 days later.  *See* ECF 257.   And, according to the government, "all of the time in which the pretrial motions remained pending is excludable, up to and including November 27, 2013."  ECF 673 at 19.  *See* 18 U.S.C. § 3161(h)(1)(D) (excluding "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"); *United States v. Osteen*, 254 F.3d 521, 525 (4th Cir. 2001) (citing this provision, and noting that any "delay in resolving outstanding pretrial motions need not be reasonable for this period to be excluded from the Speedy Trial Act calculation").

The Second Reply does not respond to, or acknowledge, the government's argument as to Nyakana's June 2012 appearance.  *See* ECF 674 at 1-6.  However, the reply does contend that the Court's Speedy Trial Act Order in this case was invalid because it did not include an explicit finding that "the ends of justice . . . outweigh[ed] the best interests of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  Instead, as discussed, it explained the circumstances of the case, and concluded that exclusion under the Speedy Trial Act was "in the interest of the defendants and the interests of the public."  ECF 58 at 2.

For this argument, Wilford cites *Zedner v. United States*, 547 U.S. 489 (2006).  In *Zedner*, defendant was not tried until seven years after his indictment, after defendant, "at the suggestion of the trial judge, signed a blanket, prospective waiver of his rights under the [Speedy Trial] Act."  *Id*. at 492.  The Supreme Court held that such a prospective waiver was invalid under the statute.  *Id*. at 500-03.  Furthermore, the Supreme Court ruled that the Speedy Trial Act "requires express findings" as to the "ends-of-justice balance," which must be set forth in the record ideally around the same time as the continuance, and no later than when the court rules on a motion to dismiss under the Speedy Trial Act.  *Id*. at 506-07.  "[I]f a judge fails to make the requisite findings

regarding the need for an ends-of-justice continuance, the delay resulting from the continuance must be counted, and if as a result the trial does not begin on time, the indictment or information must be dismissed." *Id*. at 508.

In the alternative, Wilford argues that the Speedy Trial Act Order could have tolled the clock only until the initial trial date of May 7, 2012, set by the Court, rather than to the rescheduled trial date.  ECF 674 at 3.  Defendant acknowledges that, as of May 7, 2012, he had filed several pending motions, but maintains that these motions only tolled the clock until 30 days after the final motions hearing on March 8, 2013, *i.e.*, until April 7, 2013.  *Id*. at 3-4; *see* 18 U.S.C. § 3161(h)(1)(H) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court"); *Stoudenmire*, 74 F.3d at 63 ("Thus, the day a motion is filed through the day the district court holds a hearing on the motion is excluded. . . . If the court does not dispose of the motion during the hearing, the [Speedy Trial Act] permits the exclusion of an additional period-not to exceed 30 days-during which the court holds the motion under advisement and continuing through the day the order ruling on the motion is entered.") (citing *Henderson*, 476 U.S. at 332; *United States v. Parker*, 30 F.3d 542, 546 (4th Cir. 1994), *cert. denied*, 513 U.S. 1029).

According to Wilford, because the Court had not ruled on the pending motions by April 7, 2013, the clock restarted, running for 44 days until May 22, 2013, when defendant filed a pro se motion.  *See* ECF 197. The clock then restarted after June 7, 2013, when the Court decided the pending motions, running for 46 days until July 24, 2013, when Wilford filed a new motion.  *See* ECF 215.  After the Court ruled on Wilford's new motions on November 27, 2013, the clock then ran for an additional thirteen days, until the start of trial on December 11, 2013.  Thus, Wilford maintains that even if the Speedy Trial Act Order validly tolled the clock until May 7, 2012, there

were still 103 days total of time not excluded under the statute, *i.e.*, more than 70 days. *See* ECF 674 at 4.

Surveying these competing arguments, it seems clear that if any violation of the Speedy Trial Act occurred, it was certainly a technical one. But, I am not persuaded that the Speedy Trial Act Order entered in this case was defective, as Wilford asserts. The Speedy Trial Act requires "express findings" as to the ends-of-justice balance. *Zedner*, 547 U.S. at 506. Here, the Order discussed in detail the circumstances that made this case "unusual and complex," and explicitly cited to the factors specified by statute to exclude time under an ends-of-justice continuance. ECF 58. And, the Order concluded that the exclusion of time under the Speedy Trial Act was "in the interest of the defendants and the interests of the public." *Id.* at 2.

Given this content, it is not clear to me that the failure to use the specific words "ends of justice" or "outweigh" doomed the Order. Indeed, the Fourth Circuit has remarked: "'The court's statement of reasons need not be lengthy and *need not track the statutory language*,' but it should be enough to ensure that the district court considered the relevant factors and that this court has an adequate record to review." *United States v. Ellis*, 781 Fed. App'x 271, 273 (4th Cir. 2019) (per curiam) (quoting *United States v. O'Connor*, 656 F.3d 630, 643 (7th Cir. 2011)) (emphasis added).[21]

Aside from *Zedner*, the only other case cited by defendant for this argument is *United States v. Ammar*, 842 F.3d 1203 (11th Cir. 2016). In *Ammar*, the Eleventh Circuit held that the district court did not comply with the Speedy Trial Act when the judge refused to make ends-of-

---

[21] I also note that, if defendant had moved for dismissal under the Speedy Trial Act, any deficiency in the Order's language could presumably have been corrected in ruling on the motion to dismiss. *See Zedner*, 547 U.S. at 507 (Speedy Trial Act continuance findings "must be put on the record by the time a district court rules on a defendant's motion to dismiss").

justice findings, instead grounding the Speedy Trial Act continuance solely in the consent of the parties. *See id*. at 1210-12. But, that is clearly not what occurred here. And, the *Ammar* Court explicitly declined to endorse the argument that "the district court's failure to specifically utter the 'magic words,' such as 'ends of justice,'" was "dispositive." *Id*. at 1211.

Nor is it clear that an otherwise valid Speedy Trial Act Order excluding time until "the final trial date to be set in this case" (ECF 58 at 2) would not exclude time until the ultimate date of the trial, rather than the initial trial date. Indeed, the initial trial date was not itself set until after the Speedy Trial Act Order. *See* ECF 69. And, if the Speedy Trial Act Order was valid through the beginning of the trial in December 2013, then there was no Speedy Trial Act violation.

### iii.

Regardless, it is not necessary to parse whether the specific strictures of the Speedy Trial Act were violated in this particular case. Even assuming, *arguendo*, a Speedy Trial Act violation, it is abundantly clear that any dismissal would have been without prejudice. And, the weight of authority establishes that a dismissal without prejudice does not constitute prejudice under *Strickland*.

As noted, if the Speedy Trial Act's 70-day time limitation is violated, the "indictment shall be dismissed on motion of the defendant." 18 U.S.C. § 3162(a)(2). However, dismissal may be with or without prejudice. *Id*. "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of [the Speedy Trial Act] and on the administration of justice." *Id*. Further, "prejudice to the defendant" is a "factor . . . relevant for a district court's consideration," although it is not enumerated in the statute and cannot be dispositive. *United States*

44

*v. Taylor*, 487 U.S. 326, 334 (1988); *see also United States v. Thomas*, 305 Fed. App'x 960, 963 (4th Cir. 2009) (per curiam).

In *Thomas*, 305 Fed. App'x 960, the Fourth Circuit rejected the defendant's argument that his attorney was ineffective for failing to move for dismissal under the Speedy Trial Act. *Id*. at 961. The Court determined that the defendant was not "prejudiced by counsel's failure to move to dismiss the indictment based on the [Speedy Trial] Act." *Id*. at 964. This was because, given "[t]he [brief] length of delay, the seriousness of the narcotics and firearm charges, and the lack of evidence of prosecutorial neglect or misconduct causing the delay would have, at most, resulted in a dismissal without prejudice." *Id*.

Wilford acknowledges *Thomas*, although he notes it is an unpublished decision. ECF 659 at 6. But, *Thomas* is representative of the conclusion reached by numerous circuit courts. *See United States v. McLendon*, 944 F.3d 255, 261-62 (D.C. Cir. 2019); *Sylvester v. United States*, 868 F.3d 503, 511-12 (6th Cir. 2017); *United States v. Rushin*, 642 F.3d 1299, 1309-10 (10th Cir. 2011); *Chambliss v. United States*, 384 Fed. App'x 897, 899 (11th Cir. 2010); *United States v. Fowers*, 131 Fed. App'x 5, 6-7 (3d Cir. 2005). Indeed, I am not aware of any circuit court that has held to the contrary.

*McLendon*, 944 F.3d at 261-62, is also instructive. There, the D.C. Circuit noted that "several other circuits" have concluded that "counsel's failure to obtain a dismissal without prejudice" does not "constitute[] *Strickland* prejudice." *Id*. at 261 (citing *Thomas* and other cases above). The *McLendon* Court "acknowledge[d] that a dismissal without prejudice forces the government to reindict the defendant in order to secure a conviction," but "recognize[d] that it would be the exceedingly rare case in which a defendant could show a *reasonable* probability that,

45

absent counsel's failure to obtain a dismissal without prejudice, the outcome of the criminal prosecution would be different." *Id*. at 262 (emphasis in original).

The circumstances are analogous here. Wilford was charged with an extremely serious offense, involving large-scale drug trafficking, and with substantial evidence against him. There is no suggestion of "prosecutorial neglect or misconduct causing the delay." *Thomas*, 305 Fed. App'x at 964. Any dismissal would have occurred in the context of a Speedy Trial Act Order that had been entered in the case with the consent of all parties, and in the context of delays due, in large part, to the numerous pretrial motions filed by defendant. I cannot discern any prejudice to defendant from the delay. Thus, dismissal would certainly have been without prejudice.

And, there is no indication that the government would not have sought a new indictment, given the seriousness of the charge and its diligence in prosecuting the case. Nor is there any real indication that, had the government obtained a new indictment, the ensuing prosecution would have faced any obstacle that the original prosecution did not also encounter.

Indeed, defendant makes no more than a cursory argument that he faced prejudice, or that dismissal would have been with prejudice. At most, he makes a vague claim that the delay from reprosecution would have given defense counsel "additional time and potential bargaining power" to negotiate a plea. ECF 659 at 10. But, this contention is not persuasive, particularly given Wilford's apparent disinterest in any plea until immediately before trial. In addition, at sentencing Wilford made a vague reference to witnesses not being available, or witnesses' memory being faulty, because of the delay in going to trial. *See* ECF 389 at 23. But, he offered no specifics, and this argument has not been pursued in the Petition.

Wilford devotes more space to an argument that dismissal under the Speedy Trial Act should constitute *Strickland* prejudice, regardless of whether that dismissal is with or without

prejudice. *See* ECF 659 at 7-9. He contends that *Strickland* prejudice properly looks to the effect on the instant case, not on any subsequent proceedings. But, as discussed, this is not the state of the law, or consistent with the conclusion of the Fourth Circuit and other circuit courts. Notably, Wilford does not identify a single Speedy Trial Act case where a court has adopted the position he advances.[22]

In sum, it is not clear to me that there was any Speedy Trial Act violation. But, even if there were, Wilford cannot show prejudice from counsel's failure to call attention to his lack of arraignment, whether under the Speedy Trial Act or otherwise. Therefore, this ineffective assistance claim must fail.

### 2. Advice as to Pretrial Motions

### i.

As described above, defense counsel filed numerous pretrial motions, aimed at the suppression of evidence. I denied the motions (*see* ECF 205; ECF 252), and those rulings were affirmed by the Fourth Circuit on appeal. *See Wilford*, 689 Fed. App'x at 729-30.

In the Second Supplement, Wilford maintains that counsel rendered deficient performance by overstating the merits of these suppression arguments to Wilford, rather than correctly advising that none had merit. ECF 659 at 11-15. And, according to the Petition, if Wilford had been properly advised by counsel, he would have pled guilty rather than proceed to trial. *Id*.; *cf. Lafler*, 566 U.S. at 164 (when defendant claims that ineffective assistance led to the rejection of a plea offer, he "must show that but for the ineffective advice of counsel there is a reasonable probability

---

[22] Wilford cites to a handful of out-of-Circuit cases to support his general argument that the prejudice analysis looks only to the instant case, but none concern the Speedy Trial Act. *See Martin v. Grosshans*, 424 F.3d 588, 490 (7th Cir. 2005); *Sierra v. State*, 230 So.3d 48, 52 (Fla. App. 2017); *Miller v. State*, 548 S.W.3d 497, 499-500 (Tex. Crim. App. 2018).

that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.").

Thus, the Second Supplement asserts that Wilford "is entitled to be reoffered the most favorable plea offer originally made." ECF 659 at 14. And, he contends that the government should be required to withdraw the § 851 enhancement it filed, which resulted in Wilford's 20-year mandatory minimum sentence. *Id*.

With the Second Supplement, Wilford has submitted a Declaration that focuses on this claim. *See* ECF 661-1. He avers that "[v]ery early on in Purpura's representation," Purpura informed him that the government had offered a plea deal of "less than 10 years in prison." *Id*. ¶ 3. However, according to Wilford, he rejected this offer "based on [his] belief that Purpura would be able to file a successful motion to suppress the bulk of the prosecution's evidence for Fourth Amendment violations." *Id*. "Later," at an unspecified time, the government offered a 15-year plea deal, which Wilford maintains he rejected for the same reason. *Id*. Wilford states that he "trusted Purpura's advice that the various Fourth Amendment claims that he raised in his pretrial motion had merit and stood a good chance of winning in front of the district court or at least on appeal to the Fourth Circuit," and he turned down the plea offers based on that advice. *Id*. ¶ 4. Wilford avers: "If I had been advised by Mr. Purpura that the Fourth Amendment claims that he raised lacked merit and stood very little chance of prevailing, I would have accepted the prosecution's initial plea offer and also its subsequent plea offer." *Id*. ¶ 5.

48

I am not persuaded by this argument, primarily for two reasons.  First, the Petition exaggerates the extent to which Wilford's pretrial suppression motions were devoid of merit.  The Petition depicts the arguments in the suppression motions as practically frivolous, such that Purpura should have explained to Wilford that they "lacked merit and stood very little chance of prevailing," a characterization Wilford asserts would have persuaded him to accept the government's plea offer.  ECF 661-1, ¶ 5.

This goes too far.  The suppression arguments were rejected by this Court and, subsequently, by the Fourth Circuit.  However, an unsuccessful argument is not necessarily a frivolous one.  Certainly, some of the defendant's arguments were stronger than others.  But, resolution of the motions involved several days of hearings and two opinions by this Court, totaling a combined 71 pages—hardly the sign of meritless submissions.  *See* ECF 205; ECF 252.

Ultimately, I agreed with the government in upholding the use of warrantless GPS devices under the good faith exception.  ECF 205 at 25-42.  However, I remarked, *id*. at 38-40:

> To be sure, the Fourth Circuit had not opined on the legality of warrantless GPS tracking devices at the time of the Hayes DTO investigation.  And, I recognize that other federal courts have, since *Jones*, determined that the good faith exception does not apply in the absence of binding federal appellate precedent. . . .
>
> As Wilford points out, the investigation of the Hayes DTO began after the D.C. Circuit's decision in *Maynard* [615 F.3d 544], in which that court held that the warrantless use of a GPS device to track a target vehicle's movements for 28 days constituted an illegal search under the Fourth Amendment . . . .  At least one federal trial court has agreed with Wilford that a circuit split as to this issue defeats the good faith exception, in the absence of binding federal appellate precedent in the applicable circuit. . . .  And, at the relevant time, no Fourth Circuit decision had approved of the agents' conduct.

Regarding the cell phone pinging, I acknowledged: "No judicial decision offers any guidance as to the scope of the Maryland statute with respect to pinging."  ECF 205 at 47.  And, as to the request for a *Franks* hearing, I found that one of Wilford's arguments "merit[ed] further

attention," given that he specifically identified several factual inaccuracies in relevant search warrant applications, although I concluded that the inaccuracies were the result of negligence. ECF 205 at 58; *see also id.* at 57-61.  Finally, I partially granted Wilford's disclosure motion (ECF 165).  ECF 205 at 21-25.  Although this was not a suppression issue, the resulting material provided much of the basis for Wilford's subsequent motion to reconsider my suppression ruling.  *See* ECF 217.

The performance prong of *Strickland* "sets a high bar," *Buck*, 137 S. Ct. at 775, that "must be applied with scrupulous care."  *Richter*, 562 U.S. at 105.  In particular, a claim must be evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation," *Palacios*, 982 F.3d at 924, and "avoid the distorting effects of hindsight."  *Morris*, 917 F.3d at 823. To the extent that Wilford contends that, to render effective assistance, Purpura was required to advise defendant that the suppression motions "lacked merit and stood very little chance of prevailing" (ECF 661, ¶ 5), his claim is unfounded.

**ii.**

In any event, Wilford has not satisfied *Strickland*'s prejudice prong; that is, he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

In Wilford's Declaration (ECF 661-1), submitted with the Second Supplement, he asserts that had Purpura described the suppression motions as having very little chance of success, he would have taken the government's plea offer.  But, such a conclusory, self-serving, and post hoc assertion, reflected nowhere else in the record, does not suffice.  As the Fourth Circuit has remarked, in the analogous context of a defendant who claims he would not have taken a plea deal but for counsel's ineffective advice: "[T]he defendant has an incentive to claim, in retrospect, that

the result of the plea process would have been different regardless of whether that claim is, in fact, true. . . . Thus . . . we require defendants asserting deficiencies in the plea-bargaining process to provide *evidence of their sincerity*." *United States v. Murillo*, 927 F.3d 808, 815-16 (4th Cir. 2019) (emphasis added); *see also, e.g.*, *Rosario-Dominguez v. United States*, 353 F. Supp. 2d 500, 520 (S.D.N.Y. 2005) (noting that "no testimonial hearing is required" when defendant who went to trial "has submitted only conclusory and/or self-serving affidavits on the issue of whether [defense counsel] communicated plea offers to him").

As the government notes (ECF 673 at 20), in Purpura's motion to withdraw (ECF 285), filed in February 2014, he stated, *id.* ¶ 5:

> During this time period counsel entered into plea negations with government counsel and obtained a plea (for a third time federal offender) that could have resulted in a favorable sentence and the return of certain specified assets. Mr. Wilford was fully aware if he were convicted at trial his decision not to negotiate a plea agreement would lead to a mandatory minimum sentence of 20 years up to a maximum sentence of life. Mr. Wilford followed his own advice, declined the government's offer and demanded full litigation of all legal issues and a trial.

This assertion is consistent with the statements made at the outset of trial, under *Lafler*, 566 U.S. 156.  ECF 308 at 13-14.  At the time, it was made clear that the defendant had rejected the government's plea offer.  *Id.* at 14.  As noted, Purpura also said that he had recently conveyed a proposed plea deal to the government on Wilford's behalf.  *Id.*  But, counsel agreed that there had been no substantive plea negotiations since April 2012.  *Id.* at 13-14.

At sentencing, Wilford made comments to the effect that he wanted to plead guilty at certain points before the trial, but was not able to do so.  *See* ECF 369 at 163-67.  Nevertheless, the record does not suggest that if Purpura had informed defendant that his suppression arguments were bound to fail, he would have accepted the government's earlier plea deal, as he now asserts. I rejected defendant's main suppression motion in my Memorandum Opinion of June 7, 2013 (ECF

205), months before trial.  The trial began in December 2013.  In all that time, Wilford did not

seek to negotiate a plea until the eve of trial.

Defendant appears to argue (ECF 674 at 9) that Wilford's last-minute plea offer was

prompted by my ruling of November 27, 2013 (ECF 252), which finally put to rest defendant's

suppression arguments.  But, this is not reflected in the record.  Wilford stated as follows at

sentencing, ECF 369 at 165-66:

> [Wilford:] So from that point on, moving forward up to the end of 2013,
> beyond the motions hearings, we came to this courtroom and we had a hearing on
> November the 6th. A week after that hearing, Mr. Purpura sent me a letter telling
> me that I'll come and see you immediately upon Judge Hollander's ruling on the
> hearing.
>
> Well, on November 27th, Mr. Purpura shows up. He doesn't make me aware
> that you rendered your opinion. He asked me would I be willing to entertain a plea
> offer.
>
> THE COURT: Who asked you that? Mr. Purpura?
>
> THE DEFENDANT: Mr. Purpura. So I said, Well, you know, what is it,
> where is it? He said, Well, I don't have one but I want to know if you're interested
> in one because I'll go and communicate, we can communicate this to the
> prosecution. Again, he doesn't share with me the fact that you rendered your
> opinion that day. So we talked and I communicated something to him that he would
> take and offer [the prosecutor].
>
> Well, on December the 3rd, which was a week later, Mr. Purpura comes
> back. He tells me the prosecution is not interested, they want to move forward and,
> by the way, here's Judge Hollander's opinion. She ruled against you. Don't look at
> it right now. Take it back with you. We'll discuss that later.
>
> So we talked about an hour or so. He left. And as I went back to my cell, I
> look at your opinion. I said, Wow. I wrote him, asked him to file, a motion in light
> of your ruling, to suppress the derivatives (sic) UPS evidence. Well, at the time,
> this was December the 3rd, 2013. Trial was scheduled for December the 9th, which
> was that upcoming Monday. So I didn't see him until that Monday.
>
> We showed up here, as you recall, it was a snowstorm. We still made it to
> the courtroom, courthouse, but everything was postponed. He came up to see me,
> up in the bullpen. We talked. I asked him did he file a motion. He told me he did

not. We talked about everything. He agreed that it should be filed. He agreed that
he was going to file it that day.

Based on Wilford's narrative at sentencing, defendant suggested a potential resolution to
Purpura, to pass on to the government, *before* he knew about my ruling of November 27, 2013.
And, when Wilford subsequently learned of my ruling, his reaction was *not* to redouble his efforts
to plead, but rather to insist that defense counsel file *another* motion, asking the Court to
reconsider.  In addition, Wilford seemed to indicate at sentencing that he did not want to agree to
a plea that did not allow him to "preserve [his] Fourth Amendment issues" for appeal.  ECF 369
at 166.  The apparent importance Wilford assigned to preserving these issues on appeal during the
plea bargaining suggests he still believed they had merit, rather than that he realized the contentions
were meritless.

Furthermore, nothing in the content of Wilford's previous filings hints at the idea that
defendant would have taken the government's earlier plea offer, had Purpura advised him that his
suppression motions were meritless.  The Second Supplement grounds this argument in the
following claim from Wilford's original Petition: "Trial counsel was ineffective for failing to
discuss with Wilford possible plea offers or the potential consequences should Wilford lose at
trial."  ECF 546 at 10; *see* ECF 659 at 2.  But, this cursory claim is hardly an assertion that Purpura
offered Wilford poor advice regarding the suppression motions, or that had Purpura advised
Wilford correctly, defendant would have pled guilty.

In the First Supplement and the First Reply, which were submitted pro se, Wilford indicates
that he turned down the government's plea offer around April 2012 because Purpura gave him
incorrect advice as to whether the government could try him in the District of Maryland—an
entirely different issue.  *See* ECF 615 at 5; ECF 615-1 (Wilford Aff.), ¶¶ 4-5; ECF 650 at 8.  In his
First Reply, Wilford suggests that he "could not in good faith accept" a plea agreement "while

53

knowing the Government was suppressing" evidence in violation of *Brady v. Maryland*, 473 U.S. 83 (1963).  ECF 650 at 21-22.  But, Wilford does not state in these filings that he turned down the initial plea offers because of Purpura's advice as to the strength of the suppression motions, or that his belief in the strength of the motions was subsequently undermined.

More broadly, Wilford's years of voluminous filings hardly suggest a chastened defendant who belatedly realized that his Fourth Amendment arguments had little merit, and would have taken the government's plea offer had his attorney only told him that the motions were baseless. To the contrary, if Wilford's submissions leave any impression, it is of a defendant who continues to be absolutely convinced by the truth of his arguments, and of the injustice that has been inflicted upon him.

Indeed, Wilford's prior filings contain numerous ineffective assistance of counsel claims involving additional Fourth Amendment and suppression arguments he contends Purpura should have made, or made inadequately.  *See, e.g.*, ECF 615 at 6-8.  And, I note that a necessary component of an ineffective assistance of counsel claim premised on failure to file a suppression motion is the contention that the motion "was meritorious and likely would have been granted." *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 525 (4th Cir. 2016).

In my view, there is no basis for the claim that Purpura was ineffective for failing to inform Wilford that his suppression arguments "lacked merit and stood very little chance of prevailing." ECF 661-1, ¶ 5.  But, even assuming deficient performance by Purpura, Wilford has made only a conclusory assertion as to any prejudice.

### 3. Representation on Appeal

In Wilford's third contention, he claims that, during a portion of defendant's direct appeal to the Fourth Circuit, the Fourth Circuit improperly permitted Wilford to proceed pro se, without

adequately ensuring that his waiver of the right to counsel was knowing, voluntary, and intelligent. ECF 659 at 15-18.  Thus, according to the Second Supplement, "this Court must presume prejudice and order that Mr. Wilford be permitted to have an out-of-time appeal at which he is represented by counsel during the entirety of the direct appeal process." *Id*. at 18.

Defendant cites to no authority that might enable the Court to take this step.  The Fourth Circuit, like other circuits, has permitted a district court to authorize an out-of-time appeal by vacating the judgment and reimposing an identical judgment, thus resetting the appeal clock.  *See, e.g.*, *United States v. Mongold*, 259 Fed. App'x 539, 540 (4th Cir. 2007) (per curiam) (collecting cases).  The typical context for such a practice is when counsel was ineffective for failing to file an appeal at all.  *See id*.

Here, a timely appeal was filed.  But, Wilford appears to ask the Court to issue instructions to the Fourth Circuit as to how it must handle the appeal, *i.e.*, by ensuring that Wilford is represented by counsel throughout the entire appeal.  Moreover, the requested remedy would rest, explicitly or implicitly, on a determination by this Court that the Fourth Circuit erred during its consideration of Wilford's direct appeal—a determination it is hardly this Court's place to make.

The government does not contest that the Court may order the remedy requested by the Second Supplement.  And, defendant is quite right (ECF 659 at 18) that "the presumption of prejudice must extend as well to the denial of counsel on appeal." *Penson v. Ohio*, 488 U.S. 75, 88 (1988) (right to counsel on appeal violated when counsel permitted to withdraw merely by filing motion asserting that appeal would be meritless).  But, in any case, a review of the record on appeal makes clear that any allegation that defendant was denied counsel, except as a result of his clearly expressed desire to proceed pro se, borders on the frivolous.

In *United States v. Wilford*, No. 14-4643 (4th Cir.), the Fourth Circuit appointed Jenifer Wicks to represent Wilford on appeal. *Id.*, ECF 2.[23]  She had represented Wilford at sentencing. In September 2014, however, Wilford submitted a pro se "Notice of Appearance and Termination of Attorney Jenifer Wicks." *Id.*, ECF 14.  The Fourth Circuit requested a response from Wicks. *Id.*, ECF 15.  Wicks advised the Court that Wilford had made allegations that she was deficient in her representation. *Id.*, ECF 16, ¶ 9.  Therefore, she asked the Court to appoint new counsel. *Id.* Thereafter, the Court relieved Wicks of further representation and appointed Steven Levin as Wilford's new appellate counsel. *Id.*, ECF 20.

Wilford then filed a pro se document entitled "Rejection of Attorney Steven Hale Levin . . . ." *Id.*, ECF 25.  The document is difficult to understand, but appears to be related to Wilford's contention that the appeal was invalid because the district court lacked jurisdiction over his case in the first place. *Id.*  The Fourth Circuit Clerk's Office responded by letter, stating that Levin was appointed at Wilford's request after defendant indicated his intent to proceed with his appeal, and that the appeal would move forward with Levin as Wilford's counsel. *Id.*, ECF 27. This was followed by a series of pro se filings in which Wilford at first appeared to seek to voluntarily dismiss his appeal, but then reversed himself. *See, e.g.*, *id.*, ECF 30; ECF 37.

In November 2014, Wilford filed a pro se "Notice of Appearance and Termination of Attorney Steven Hale Levin," in which he expressed his intent to "proceed in Appeal case number 14-4643 in an interim while new counsel is hired," apparently meaning he would proceed pro se.

---

[23] As noted, Wilford also appealed my ruling at ECF 445 and ECF 446, denying his motion to dismiss for lack of jurisdiction (ECF 416) and denying his motion for a new trial (ECF 418). *See* ECF 459. Wilford represented himself. *See* Docket, *United States v. Wilford*, No. 16-6669 (4th Cir.). Initially, the Fourth Circuit deconsolidated this case from No. 14-4643, Wilford's direct criminal appeal. *See* Docket, No. 16-6669, ECF 2. Later, the Fourth Circuit reconsolidated the cases (*id.*, ECF 25), and then decided them both in the same opinion. Wilford's argument only relates to his direct criminal appeal, No. 14-4643.

*Id.*, ECF 40.  Levin informed the Fourth Circuit that he had communicated with Wilford and that, if Wilford's motion to relieve counsel was granted, it was defendant's intention to proceed pro se. *Id.*, ECF 42.  Levin moved to withdraw at approximately the same time.  *Id.*, ECF 43.  The Fourth Circuit granted the motion.  *Id.*, ECF 44.

In response to the Fourth Circuit's request that Wilford complete status of counsel and waiver of right to counsel forms, defendant obtained an extension while he hired new counsel.  *See id.*, ECF 45; ECF 47; ECF 48; ECF 49; ECF 51; ECF 53.  In May 2015, Linda M. Wagoner entered an appearance as Wilford's retained counsel.  *Id.*, ECF 54.  She then obtained a series of briefing extensions, such that briefing had not been completed by December 2015, when the Fourth Circuit granted the government's unopposed motion to hold the appeal in abeyance pending this Court's resolution of Wilford's various pro se motions.  *Id.*, ECF 101.  After this Court denied those motions, Wagoner completed defendant's appellate briefing.  *See id.*, ECF 117 (Wilford's opening brief); ECF 121 (government's response); ECF 125 (Wilford's reply).  Following the conclusion of briefing, and while still represented by Wagoner, Wilford also submitted various supplemental briefs and other filings to the Fourth Circuit.  *See id.*, ECF 126; ECF 130; ECF 132; ECF 133.

In November 2016, Wagoner submitted a motion to the Fourth Circuit to withdraw as counsel.  *Id.*, ECF 134.  She indicated that she was winding down her practice due to health issues. *Id.* ¶ 3.  She also asserted that her relationship with Wilford was "irretrievably broken" due to "lack of communication."  *Id.* ¶ 4.  The Fourth Circuit Clerk's Office provided Wilford with notice of the motion, and a status of counsel form to complete.  *Id.*, ECF 135.  Wilford responded with a submission indicating that he was "completely blindsided" by Wagoner's filing, and noting that she remained counsel until the Court ruled on her withdrawal motion.  *Id.*, ECF 136.  He also repeated his prior jurisdictional arguments which, he asserted, precluded the Fourth Circuit from

ruling on the motion to withdraw.  *Id.*  The Court then sent him another status of counsel form to complete.  *Id.*, ECF 137.

Wilford submitted a new filing, indicating that he would "consider any other options pertaining to his counsel" if the Court granted Wagoner's withdrawal motion.  *Id.*, ECF 138.  He also returned the status of counsel form, checking the box that he did not desire new counsel to represent him.  *Id.*, ECF 139.  However, he included an addendum indicating that he did not wish counsel to represent him unless certain conditions were satisfied.  *Id.*  Specifically, Wilford asserted that his case not only required "very high expertise" but also that his past counsel had been "influenced or intimidated by governmental thuggeries," and that therefore he had to be able to "pre-screen" any prospective counsel to ensure their "loyalty."  *Id.* at 2.  He concluded: "[U]ntil the pre-screening chance is afforded him, Wilford will proceed in pro se."  *Id.*

In January 2017, the Fourth Circuit granted Wagoner's withdrawal motion.  *Id.*, ECF 141. And, it appointed Jonathan Gladstone to represent Wilford under the Criminal Justice Act.  *Id.*, ECF 142.  Wilford filed a pro se "Denial of Consent and Rejection of Attorney Jonathan Alan Gladstone," because he had not been afforded his desired pre-screening.  *Id.*, ECF 143.  The Court issued an order on February 21, 2017, denying what it termed Wilford's "pro se motion that his new counsel be removed."  *Id.*, ECF 145 at 2.  It noted that the case was briefed, and that "Counsel's appointment is limited to participating in oral argument, should the court determine argument is necessary, and representing appellant with respect to the filing of any petition for rehearing or petition for writ of certiorari."  *Id.*

The next day, a new "Motion to Withdraw" from Wilford was docketed. *Id.*, ECF 146.[24] In this motion, defendant asserted: "Notwithstanding Appellant's several filings with this court advising that he would proceed pro se, on 1/17/17 the court's clerk impermissibly appointed Jonathan Alan Gladstone in this case." *Id.* at 1. He also noted that he had spoken via the telephone with the Court's case manager and expressed his intention to continue pro se unless and until oral argument was ordered. *Id.* He concluded: "I Richard Wilford, Appellant, **do not** desire an attorney to represent me in the above pending case in the United States Court of Appeals at this time." *Id.* at 2 (boldface in original). He also filed a separate "Motion to Proceed Pro-Se," likewise expressing his desire to proceed without counsel. *Id.*, ECF 147. For good measure, he docketed with the Court a letter he had sent to Gladstone reflecting that he did not consent to Gladstone's appointment, and stating: "I warn and give 'notice' that if you are not removed from my case I will have to sue you." *Id.*, ECF 149. And, in response to ECF 145, defendant filed an "Objection" contending that the Order was improper because "Appellant had expressed to the court that he **does not** want appointment of counsel at this time." *Id.*, ECF 151 at 3 (boldface in original).

Following these various submissions, the Fourth Circuit issued a new Order on March 7, 2017. *Id.*, ECF 153. It construed Wilford's filings as a motion for reconsideration of its Order of February 21, 2017, "grant[ed] reconsideration, terminate[ed] the appointment of Jonathan Gladstone to represent appellant on appeal and permit[ted] appellant leave to proceed pro se." *Id.*

---

[24] Although ECF 146 was docketed the day after ECF 145, it appears that Wilford mailed ECF 146 before ECF 145 was issued.

Wilford was without counsel for the remainder of the direct appeal.  In March and April 2017, he filed supplemental briefing.  *See id*., ECF 155; ECF 158.[25]  And, on May 9, 2017, the Fourth Circuit issued its ruling, affirming this Court.  *Id*., ECF 159.  Thereafter Wilford moved for rehearing and rehearing en banc.  *Id*., ECF 165.  At approximately the same time, he submitted a motion for the appointment of counsel, now contending that he had "wrongfully rejected" appointed counsel and "mistakenly" proceeded pro se.  *Id*., ECF 167.  On June 20, 2017, the Court denied the motions.  *Id*., ECF 170.  In August 2017, Wilford moved again for counsel (*id*., ECF 174), which was denied.  *Id*., ECF 175.  Defendant filed a petition for writ of certiorari in November 2017 (*id*., ECF 177), which was denied the next year.  *Id*., ECF 178.

The Second Supplement argues that the Fourth Circuit improperly permitted Wilford to proceed pro se during the three-month period between the Fourth Circuit's Order of March 7, 2017, and the denial of rehearing en banc on June 20, 2017.  As the above narrative reflects, this contention is wholly without merit.  To the contrary, the Fourth Circuit worked diligently to ensure that Wilford was represented by counsel throughout the course of his appeal.  No fewer than three attorneys (Wicks, Levin, and Gladstone) were appointed by the Court under the Criminal Justice Act to represent Wilford.  And, Wagoner was retained.  When Wilford initially attempted to reject Gladstone's appointment, the Fourth Circuit prevented him from doing so.  It was only after numerous submissions and other communications with the Court, in which Wilford explicitly, deliberately, and unreservedly made clear his desire to proceed pro se—to the point of threatening legal action against Gladstone—that the Fourth Circuit relented and allowed him to do so.  His

---

[25] The same document appears to have been docketed twice. Although docketed as "Supplemental Authorities" under Fed. R. App. P. 28(j), it is more in the style of a supplemental brief.

belated, post hoc motion for counsel while seeking rehearing en banc (*see id.*, ECF 167) does not detract from this.

I emphasize that Wilford has hardly been hesitant to represent himself and assert his claims in these proceedings, and has accumulated significant experience with criminal litigation.  There is no evidence in the record that Wilford's vigorous insistence, in early 2017, that he wished to represent himself without counsel was anything but deliberate and voluntary.  Moreover, by the time the Fourth Circuit granted Wilford's motion to proceed pro se, the case was fully briefed by a lawyer acting on Wilford's behalf.  Although Wilford submitted supplemental briefing after this point (*see id.*, ECF 155; ECF 158), he was under no obligation to do so, and there is no indication from the Fourth Circuit's opinion that these submissions played any role in the Court's decision. *See Wilford*, 689 Fed. App'x 727.

For his contention (ECF 659 at 17-18) that the Fourth Circuit was required to go further and remand the case to this Court for "a hearing" to determine the adequacy of Wilford's decision to waive his right to counsel, defendant cites to three out-of-Circuit state court cases taking such a step.  *See Com. v. Grazier*, 713 A.2d 81, 82 (Pa. 1998); *Watson v. State*, 564 A.2d 1107, 1109 (Del. 1989) (same); *Sickles v. State*, 170 S.W.3d 298, 299-300 (Tex. App. 2005).  None of these cases are binding on the Fourth Circuit, and I do not take any to suggest that the Fourth Circuit's actions here were improper, even if I were in a position to make such a determination.

In sum, it is not clear to me that I have the authority to take the steps requested by the Second Supplement—that is, "order that Mr. Wilford be permitted to have an out-of-time appeal at which he is represented by counsel during the entirety of the direct appeal process."  ECF 659 at 18.  And, in any event, there is no basis for me to do so.

### C. Discovery Motion

In a pro se motion, predating the Second Supplement, Wilford seeks to conduct discovery regarding the Petition.  ECF 656.  In particular, he requests the disclosure of numerous categories of documents, as well as "to have all attorneys answer the attached interrogatories."  *Id*. at 3-4. Discovery relating to the Petition is governed by Rule 6 of the Rules Governing Proceedings under 28 U.S.C. § 2255.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see also Harris v. Nelson*, 394 U.S. 286, 295 (1969) (stating that the "broad discovery provisions" of the Federal Rules of Civil Procedure do not apply in habeas petitions); *United States v. Saint-Jean*, 684 F. Supp. 2d 767, 773 (E.D. Va. 2010) ("Discovery is extremely limited in habeas corpus proceedings.").  Instead, a habeas petitioner "may engage in discovery only with leave of the court, after good cause is shown."  *Ramey v. United States*, RWT-12-309, 2014 WL 12661574, at *1 (D. Md. Feb. 14, 2014).  And, "good cause" exists under Rule 6(a) when the petition establishes a prima facie case for relief.  *Nelson*, 394 U.S. at 290.

Under Rule 6(b), the party requesting discovery must provide "reasons for the request" and "must specify any requested documents."  Leave to conduct discovery is appropriate "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  *Nelson*, 394 U.S. at 300,; *see Bracy*, 520 U.S. at 908-09; *United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004).

Notably, "Rule 6 does not 'sanction fishing expeditions based merely on a petitioner's conclusory allegations.'"  *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (citation omitted); *see Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007); *Ramey*, 2014 WL 12661574, at *1.  Nor is

"good cause" shown "where a defendant bases a discovery request on a claim that fails as a matter of law." *Ramey*, 2014 WL 12661574, at *1 (citing *Thomas v. Taylor*, 170 F.3d 466, 474-75 (4th Cir. 1999)).

Wilford has not shown good cause to engage in discovery. As discussed, *supra*, the § 2255 claims are without merit. And, Wilford has given the Court no reason to believe that he could demonstrate an entitlement to relief by the further development of facts through discovery. To the contrary, the vast documentation sought by Wilford's discovery motion bears every hallmark of a fishing expedition, which is not permitted by Rule 6. I will deny ECF 656.

### D. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

I conclude that Wilford has not made a substantial showing of the denial of a constitutional right.  Therefore, I will not issue a COA.

### III.  Other Motions and Submissions

As mentioned, Wilford has also filed a plethora of other pro se motions and submissions, some of which defy easy description.

ECF 528 is a "Motion for Reconsideration" of the Court's Memorandum (ECF 525) and Order (ECF 526) of May 4, 2018.  The Court's ruling of May 4, 2018, denied Wilford's "Memorandum and Motion to Dismiss for Lack of Subject-Matter Jurisdiction . . . ."  *See* ECF 507.  In ECF 525, I noted that Wilford's arguments in ECF 507, relating to lack of arraignment and subject matter jurisdiction, were essentially identical to those he advanced in his previous motion at ECF 416.  I denied ECF 507 for the reasons I had denied ECF 416, as well as the reasons in the Fourth Circuit's opinion in *Wilford*.  *See* ECF 525 at 4.  In ECF 528, Wilford presents no persuasive grounds for reconsideration of my previous decision.  Therefore, I will deny ECF 528.

ECF 533 is a motion for leave to supplement ECF 528 with additional briefing.  The additional briefing is docketed at ECF 534.  I will grant ECF 533 and permit Wilford to supplement ECF 528.  However, the additional material at ECF 534 does not change the outcome regarding ECF 528.

ECF 536 is a motion for a hearing, apparently regarding ECF 528.  I will deny ECF 536; no hearing is needed to resolve ECF 528.  And, ECF 570, captioned "Defendant's Motion to Compel Judgment," seeks a ruling from the Court on ECF 528.  As I have denied ECF 528, I will deny ECF 570, as moot.

ECF 535 is a "Request to Take Judicial Notice" pursuant to Fed. R. Evid. 201(c)(2). Although not entirely clear, this appears to be a request for the Court to take judicial notice that,

according to Wilford, the conspiracy charge against him arose from conduct that did not occur in the District of Maryland.  Wilford asserts that this has implications for the Court's jurisdiction.  This is not a proper use of Fed. R. Evid. 201, which permits the Court to "judicially notice" an adjudicative fact "that is not subject to reasonable dispute."  Fed. R. Evid. 201(b).  It is also clear from the factual summary that much of the conduct did occur in Maryland.  I will deny ECF 535.

ECF 557 is titled "Motion to Correct Clerical Error."  It is premised on Fed. R. Crim. P. 36, which provides: "After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission."  Specifically, Wilford seeks to correct his Judgment, which indicates that he was found guilty "after a plea of not guilty."  ECF 354 at 1.[26]  Wilford maintains that the Judgment should be amended to reflect that he never entered a plea of not guilty.

Although presented as a request to correct a clerical error, it is evident that with ECF 557, Wilford is using Fed. R. Crim. P. 36 as another avenue to litigate his underlying substantive claims related to the lack of formal arraignment.  This is not an appropriate use of this rule.  *See, e.g.*, *United States v. Mackay*, 757 F.3d 195, 200 (4th Cir. 2014) ("'It is only mindless and mechanistic mistakes . . . and no new additional legal perambulations which are reachable through' Rule 36.") (internal citation omitted); *United States v. Powell*, 266 Fed. App'x 263, 266 (4th Cir. 2008) (noting that an error corrected under Fed. R. Crim. P. 36 "may not be a judicial or substantive error but must be purely clerical").  Defendant did not plead guilty or nolo contendere, which are the other two options on the Judgment form.  Rather, he proceeded to trial after vigorously contesting

---

[26] Although Wilford references ECF 354, an Amended Judgment was issued pursuant to Fed. R. Crim. P. 36 on February 17, 2016. *See* ECF 443. The Amended Judgment corrected this line on the Judgment to reflect that Wilford was found guilty on count "1s" rather than count "1," after a plea of not guilty. *Compare* ECF 443 at 1 *with* ECF 354 at 1. The "plea of not guilty" language that Wilford seeks to correct is the same in both documents.

the charge.  Moreover, Wilford will suffer absolutely no prejudice, or indeed any impact at all, from the current language of the Judgment.  I will deny ECF 557.

ECF 566 is a "Motion to Compel" Purpura to surrender his case file to Wilford.  This motion dates from April 2020, and it is not clear that the issue raised in this motion persists. Accordingly, I will deny ECF 566, without prejudice to Wilford's ability to raise this issue again, as necessary.

Finally, as noted, plaintiff has filed two documents generally detailing his grievances regarding this case.  ECF 562; ECF 616.  Although ECF 562 was docketed as a supplement to the Petition, it is captioned "Letter to the Court" and does not mention the Petition at all.  ECF 562 is focused on Wilford's complaints as to jurisdiction and failure to enter a plea, which the Court has already addressed elsewhere.  *See, e.g.*, ECF 445; ECF 525.  ECF 562 concludes with a request that the Court "do what is fair and just."  ECF 562 at 12.

ECF 616 is titled "Gross Misconduct Through Unfair and Oppressive Acts by Federal Law Enforcement Officials in Their Course of Duties."   It is a seven-page laundry list of various asserted instances of misconduct by federal law enforcement, making complaints similar to those lodged by defendant throughout these proceedings, and without citation to any legal basis for the Court to take any action.  Wilford concludes: "The indictment should be dismissed and I should be released from prison."  ECF 616 at 7.

Neither ECF 562 nor ECF 616 offers any meaningful legal basis for the Court to vacate or otherwise disrupt Wilford's sentence.  The Court, and the Fourth Circuit, have already addressed some of the issues raised by these submissions, and most of the issues have also been raised in Wilford's various Petition filings.  And, the Second Supplement, which was filed after ECF 562

and ECF 616, is now the operative Petition document.  Insofar as either ECF 562 or ECF 616 were intended by defendant as motions requesting relief from the Court, they are denied.

## IV. Compassionate Release Motion

### A.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C.   § 3582(c)(1)(B);   *see*   *Jackson*,   952   F.3d   at   495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the

safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[27]
In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court
may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A));
the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B));
the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2));
and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that
compassionate release may be based on circumstances involving illness, declining health, age,
exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes
1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a
sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the
defendant's case an extraordinary and compelling reason other than, or in combination with, the
reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is
the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was
issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step
Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for
sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does
not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also
Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[27] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing
Commission to "describe what should be extraordinary and compelling reasons for sentence
reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence

reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, No. 22-6071, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors);

*United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted). And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

## B. COVID-19

### 1.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[28]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of June 28, 2022, COVID-19 has infected approximately 87.1 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed June 28, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v.*

---

[28] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

*Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In May 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer,

Moderna, and Johnson & Johnson).[29] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 30% of people from ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 91% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited June 28, 2022).

Moreover, approximately 105.1 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Jun. 13, 2022).  And, federal regulators approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

---

[29] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See,*

*e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Nevertheless, the respite did not last long. We soon experienced a surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. Indeed, a new subvariant of the virus began "spreading rapidly and will probably become the dominant form of the virus in the United States in the next few weeks." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ." Amelia Nirenberg, *A Coming Fall Surge?*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

**2.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is

particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others.  *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary

settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[30]

---

[30] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of June 28, 2022, the BOP had 140,321 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 322,440 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed June 28, 2022).

As of June 28, 2022, the BOP reported that 311 federal inmates, out of a total population of 140,321, and 336 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19. Moreover, 50,335 inmates and 12,998 staff have recovered from the COVID-19 virus. In addition, 290 inmates and seven staff members have died from the virus. The BOP has completed 128,707 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Victorville Medium I, where the defendant is imprisoned, the BOP reported that as of June 28, 2022, out of a total of 1,822 inmates, zero inmates and one staff member have tested positive, three inmates and one staff have died of COVID-19, and 534 inmates and 136 staff have recovered at the facility. In addition, 556 staff members and 4,113 inmates have been

inoculated with the vaccine at the Victorville complex.  *See* https://www.bop.gov/coronavirus/,

BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/vim/ (last visited June 28, 2022).

## C. Discussion

### 1. Extraordinary and Compelling Circumstances

In Wilford's six compassionate release submissions, he advances a number of arguments

in favor of a finding of extraordinary and compelling circumstances and, ultimately, a reduction

of his sentence to "time served."  ECF 595 at 2.  To summarize, they are as follows: his

vulnerability to COVID-19 while incarcerated, because of his various medical conditions; his

remorse and rehabilitative activities; changes to federal sentencing law regarding § 851

enhancements and his career offender status; and the overall length of his sentence, given the

nonviolent nature of his offense and the sentence offered in plea discussions.  Wilford identifies

his health conditions making him more vulnerable to COVID-19 as high blood pressure

(hypertension); "heart disease;"[31] hypolipidemia; hyperthyroidism; and obesity.  *Id*. at 4-5; *see*

*also, e.g.*, ECF 595-2; ECF 606 at 1.  He also contracted COVID-19 in January 2021.  *See* ECF

606 at 2.  The government opposes Wilford on all fronts.  ECF 629.

I am mindful that the CDC's criteria are not binding in the analysis of whether a health

condition qualifies as an extraordinary or compelling basis for compassionate release.  *See*

*Hargrove*, 30 F.4th at 194.  Nevertheless, the CDC criteria provide useful information.  Wilford is

now 49 years old.  *See* ECF 629-1 at 1.  The CDC notes that "a person's risk of severe illness from

COVID-19 increases as the number of underlying medical conditions they have increases," and

that "[o]lder adults are at highest risk of getting very sick from COVID-19," highlighting that more

---

[31] Wilford does not provide any further information as to his "heart disease," or clarify if it is distinct from his hypertension. Without more information, it is difficult to evaluate this condition.

than 81% of COVID deaths occur in people over age 65. *People with Certain Medical Conditions*, *supra*.

As for hypertension, the CDC states that "high blood pressure (hypertension)" potentially "can make you more likely to get very sick from COVID-19." *Id.* Wilford's medical records reflect that he has been prescribed medication to help control his hypertension, but that he sometimes does not take his medication. *See* ECF 629-6 at 2, 13, 14, 37, 81.

Courts have found that, in light of the COVID-19 pandemic, hypertension, combined with other conditions, qualifies as a compelling reason for compassionate release. *See, e.g.*, *United States v. Thomas*, 471 F. Supp. 3d 745, 749 (W.D. Va. 2020) ("[C]ourts . . . across the country have released individuals suffering from hypertension, but only when these individuals also suffered from other underlying medical conditions."); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason). And, there are some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

Wilford states that as of November 2020 he had a Body Mass Index ("BMI") of "over 30." ECF 595-2, ¶ 2. His medical records reflect that as of February 2021 he weighed 210 pounds. ECF 692-6 at 4. With a height of 5'9" (*see* ECF 273, ¶ 78), this yields a BMI of 31. *See Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://bit.ly/3nrYWGr (last visited June 16, 2022). The CDC defines obesity as having a BMI of 30 or greater, and states: "Overweight . . . obesity . . . or severe obesity . . . can make you more likely to get very sick from COVID-19. The risk of severe illness from COVID-19 increases sharply with higher BMI." *People with Certain Medical Conditions*, *supra*.

Numerous courts have found that, in light of the COVID-19 pandemic, obesity, particularly when combined with other chronic medical conditions, can qualify as a compelling reason for compassionate release. *See, e.g.*, *United States v. Smith*, 538 F. Supp. 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1, 458 F.Supp.3d 130 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

The CDC does not include hyperlipidemia as a condition that makes someone more likely to get severely ill from COVID. And, a number of courts have rejected compassionate release

requests premised on hyperlipidemia.  *See, e.g.*, *United States v. Contreras*, 504 F. Supp. 3d 1052, 1059 (D.S.D. 2020) ("There is no showing that suffering from hyperlipidemia . . . increases [defendant's] risk of complications."); *United States v. Saccoccia*, Cr. No. 91-115-ML, 2020 WL 6153694, at *2 (D.R.I. Oct. 19, 2020) ("Defendant's hyperlipidemia is not listed by the CDC as a comorbidity rendering him especially susceptible to COVID-19."), *aff'd*, 10 F.4th 1 (1st Cir. 2021); *United States v. Faucette*, No. 2:13-cr-79-DBH, 2020 WL 5640587, at *1 n.4 (D. Me. Sept. 22, 2020) ("The CDC has not mentioned high cholesterol as a risk factor.").  On the other hand, some judges in this District have found extraordinary and compelling circumstances for defendants who had multiple medical conditions that included hyperlipidemia.  *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23, 2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis).

Nor does the CDC identify hypothyroidism as a condition that increases vulnerability to COVID-19.  The American Thyroid Association advises: "Thus far, there is no indication that patients with autoimmune thyroid disease are at greater risk of getting COVID-19 or of being more severely affected should they acquire the COVID-19 infection."  *Novel Coronavirus (COVID-19) and the Thyroid*, AMERICAN THYROID ASS'N, https://www.thyroid.org/covid-19/coronavirus-frequently-asked-questions/ (last visited June 16, 2021).  And, many courts have rejected compassionate release motions based on hypothyroidism.  *See, e.g.*, *United States v. Leonard*, No. CR-15-08076, 2021 WL 5177862, at *3 (D. Ariz. Nov. 5, 2021) (citing the CDC and American

Thyroid Association); *United States v. Mott*, No. 5:15-CR-23-TBR, 2021 WL 933231, at *3-4 (W.D. Ky. Mar. 11, 2021) (citing hypothyroidism); *United States v. Moore*, No. 4:14-CR-00027-BRW, 2020 WL 4577165, at *1 (E.D. Ark. Aug. 6, 2020); *United States v. Numann*, No. 3:16-cr-00065-TMB, 2020 WL 1977117, at *3 (D. Alaska Apr. 24, 2020) ("There is no evidence that . . . hypothyroidism make[s] a person more susceptible to COVID-19.").

As noted, defendant previously contracted COVID-19.  He has asserted that, at the time, he was "struggling with breathing" and felt "like [his] heart [was] going to explode."  ECF 606-1, ¶ 2.  The government argues that because defendant previously had COVID-19, this militates against a finding of extraordinary and compelling circumstances.  *See* ECF 629 at 35.  But, it is by now well documented that "reinfections do occur after COVID-19."  *Reinfections and COVID-19*, C\ TRS. FOR D\ ISEASE C\ ONTROL AND P\ REVENTION, https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last updated Jan. 20, 2022); *see also, e.g.*, *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020); *United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020).

The government also made much of the fact that defendant had refused the COVID-19 vaccine.  *See* ECF 629 at 36-37.  It is true that, at the time the government submitted the Motion Opposition in March 2021, Wilford had declined vaccination the previous month.  ECF 665 at 1. However, as noted, he asserts that this was because he had tested positive for COVID-19 three weeks prior.  ECF 664.  And, records reflect that he received both doses of the Moderna COVID-19 vaccine in May and June 2021.  ECF 665 at 2.

Considering Wilford's various medical conditions—in particular, his obesity and hypertension, which numerous courts have found can justify compassionate release—I am

satisfied that, in this context, defendant has established the existence of extraordinary and compelling circumstances.

### 2. Sentencing Factors

Even when a court finds extraordinary and compelling reasons for compassionate release, however, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186. These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *Id*.

Wilford's offense was extremely serious. As discussed, Wilford played a key role in a significant and sophisticated drug trafficking operation, involving huge quantities of cocaine and enormous sums of money. As I wrote in my Statement of Reasons: "This was a large scale drug conspiracy and the defendant played a central role." ECF 355 at 3. And, as I said to defendant at sentencing (ECF 369 at 173-74):

> . . .You were pretty powerful. You were a source of an enormous quantity of drugs worth an enormous amount of money. And there's just no way to sugarcoat that. We are talking about a huge enterprise here. And you are right there, if not at the top, towards the very top of it.
>
> In sentencing, Congress says the Court must consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment for the offense. In this case, a sentence in the guidelines, I think, would satisfy that objective.
>
> Another [objective] is to deter others from such criminal conduct. And in this case, the goal of deterrence, which is one to which I subscribe very strongly, certainly would justify a very significant sentence.

To protect the public from further crimes of the defendant is yet another goal. And then rehabilitation of the defendant in the most effective manner. Of course, no sentence can be extended for the purpose of rehabilitation.

But we call these goals punishment, deterrence -- shall we say retribution and deterrence would be the first two, and then public safety and rehabilitation. All of these, in my view, would justify a very lengthy sentence.

Furthermore, defendant has a serious criminal history. This resulted in a criminal history category of IV, exclusive of the career offender designation.

Notably, prior to the instant offense, Wilford had *twice* been convicted in federal court of significant drug charges. *See* ECF 273, ¶¶ 49-50. Therefore, under the state of the law at that time, I found that defendant qualified as a career offender. However, under the current legal landscape, Wilford does not qualify as a career offender.

In his third supplement (ECF 622), Wilford emphasizes the impact of *United States v. Norman*, 935 F.3d 232, 238-39 (4th Cir. 2019), in which the Fourth Circuit determined that federal drug conspiracy under 18 U.S.C. § 846 is categorically not a qualifying offense for career offender purposes under U.S.S.G. § 4B1.2(b). He also mentions that "the First Step Act reduced the penalties associated with 21 U.S.C. § 851." ECF 622 at 2. I assume this is a reference to the fact that the First Step Act, § 401(a)(2), 132 Stat. 5220, amended 21 U.S.C. § 841(b)(1) to reduce the mandatory minimum sentence applicable to offenders with one or more prior predicate offenses from 20 years to 15 years.

Under U.S.S.G. § 4B1.1(a), a defendant is a career offender if, *inter alia*, "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense" and "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." The instant offense is drug conspiracy. Also, one of Wilford's two

predicate career offender offenses, as noted, was his conviction in 1992 for conspiracy to distribute cocaine.  *See* ECF 273, ¶¶ 46, 49, 57.

I agree with Wilford that, under *Norman*, 935 F.3d at 238-39, the offense of conspiracy—the underlying offense and one predicate—are not eligible for career offender consideration.  In other words, defendant no longer qualifies as a career offender.  It is also true that, under the First Step Act, the mandatory minimum for Wilford's offense would now be 15 years, rather than 20.

But, as the government points out (ECF 629 at 26-28), these arguments are a red herring. Wilford's sentence was not driven by the mandatory minimum; indeed, it was substantially longer. Nor was it driven by Wilford's career offender status, which produced an offense level of 37, well below the actual offense level of 40.  *See* ECF 273, ¶ 46.

Wilford was found to have a final offense level of 40 and a criminal history category of VI.  This yielded a Guidelines range of 360 months to life imprisonment.  *See* ECF 355 at 1.  If Wilford were not considered a career offender, his criminal history category, based on his nine criminal history points, would have been IV.  ECF 273, ¶ 56.  But, the Guidelines range for an offense level of 40 and a criminal history category of IV remains 360 months to life imprisonment. In other words, it would be exactly the same.

Moreover, I imposed a sentence below the Guidelines range.  Therefore, although the changes in the sentencing law identified by Wilford are accurate, the Guidelines are unchanged.

Critically, the provisions at issue were not the basis for defendant's sentence.  Defendant's prior record weighed heavily in the calculus, without regard to a label.  As I said at sentencing, "I can't ignore that this is your third federal drug prosecution.  And that is hugely significant because it creates grave concern on the part of the Court with respect to protecting the public from further

crimes of the defendant.  And that is certainly a significant component of sentencing."  ECF 369 at 177.

Notably, although the Guidelines provided for a lengthy sentence for Wilford—360 months of imprisonment to life—I imposed a sentence of 340 months.  That was below the bottom of the Guidelines and below the government's request for a 360 month sentence.

As part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today for the same offense.  As Judge Bennett has explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public."  *United States v. Johnson*, RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020).  *See also, e.g., Jones*, 2022 WL 2303960, at *1 (recognizing that courts have discretion "to *consider* leniency" in light of charges in current law) (emphasis in *Jones*); *McCoy*, 981 F.3d at 285-86; *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021); *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).  However, as discussed, the changes in the law are of no significance here, for the reasons stated.

At sentencing, I noted that Wilford was not personally associated with any violence.  *See* ECF 355 at 3; ECF 369 at 173.  Nevertheless, it is well known that drug trafficking often leads to

violence. *See United States v. Blackwell*, JKB-10-493, 2020 WL 833571, at *2 (D. Md. Feb. 19, 2020) ("There is no serious dispute that the illegal drug business brings with it violence, often lethal and on a large scale. The Court finds and concludes that those who participate in and profit from large scale, illegal drug trafficking activities are engaging in conduct that at least indirectly leads to widespread violence.")

Nonetheless, Wilford's sentence is in excess of some recent sentences in this District for serious crimes involving violence, such as murder.  As Judge Blake has observed, the average federal sentence for murder has declined in recent years.  *See United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf), *aff'd*, *McCoy*, 981 F.3d 271.  And, the trend has continued since *Bryant* was decided: data from the United States Sentencing Commission reflects that in fiscal year 2020, the national average sentence for murder was 255 months, and the Fourth Circuit average was 271 months. See United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2020, Fourth Circuit, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/4c20.pdf.

Aside from the general length of defendant's sentence, Wilford notes the disparity between that sentence and a plea deal of eight to ten years that he claims he was offered at one point by the government.  ECF 595 at 3-4, 26-27.  That ship sailed; Wilford rejected the plea offer.

Although not raised specifically by Wilford in the Motion, his 340 month sentence is also significantly longer than the sentences received by his codefendants.  None of the codefendants received a sentence greater than 180 months of imprisonment.  However, unlike Wilford, they all pled guilty.

The fact that Wilford's sentence is considerably longer than those of his codefendants is not, in and of itself, a basis for relief.  A defendant's offense level and criminal history affect the Guidelines calculation, and these factors vary with each defendant.  Codefendants may also play varying roles in an offense.  Indeed, I noted at sentencing that "there were major differences between [other defendants] and Mr. Wilford."  ECF 369 at 176.  And, the government is entitled to reward a defendant who accepts responsibility for criminal conduct and/or who spares the system the burden of a trial.  Defendant chose to reject a plea offer; he put the government, the Court, jurors, and witnesses through a trial—not to mention considerable pretrial proceedings—and later through an appeal.  On these facts, it was entirely reasonable for the government to decide that the terms of any plea offer no longer applied to defendant.

The Court is aware of the view held by some that, when the government seeks a sentence for a defendant who went to trial, greater than its plea offer, it appears to constitute punishment of the defendant for the exercise of his right to proceed to trial.  *See*, *e.g.*, *United States v. Sessoms*, ___ F. Supp. 3d ___, 2021 WL 4592522, at *3 (E.D.N.Y. Oct. 6, 2021) (finding extraordinary and compelling circumstances, in part, because defendant received harsher sentences than other defendants who did not go to trial); *United States v. Cabrera*, 531 F. Supp. 3d 863, 868 (S.D.N.Y.

2021) (Rakoff, J.) (in granting compassionate release motion, criticizing "the corrosive effects of the trial penalty," and "refus[ing] to punish a defendant for his choice to exercise his constitutional rights"); *United States v. Cano*, No. 95-00481-CR, 2020 WL 7415833, at *6 (S.D. Fla. 2020) (granting compassionate release in part based on disparity in sentences between defendant and codefendant who pleaded guilty). In the context of this case, however, I reject that view. Defendant was a central figure in a sophisticated, serious drug trafficking enterprise. He already had two prior federal drug convictions. In short, he deserved the sentence he received.

As the Fourth Circuit observed in *Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022), rejecting a "trial penalty" argument: "[I]ndividuals who opt to go to trial are not similarly situated to those who plead guilty and cooperate with the government for purposes of § 3553(a)(6)." And, the *Gillespie* Court noted more broadly that "a sentence is not 'unreasonable merely because it creates a disparity with a co-defendant's sentence.'" *Id.* (Quoting *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007), *vacated on other grounds*, 552 U.S. 1089 (2008)). *See also, e.g.*, *United States v. Ball*, No. 19-4851, 2022 WL 861823, at *2 (4th Cir. Mar. 23, 2022) (sentence disparity between codefendants not unreasonable when adequately justified).

Given the gravity of Wilford's offense, as well as his criminal history, coupled with the fact that he has only served about 40% of the sentence, immediate release is wholly unwarranted. However, considering the length of defendant's sentence, as well as his rehabilitative efforts and medical conditions, I am of the view that some reduction in his sentence is appropriate.

In considering a motion under the First Step Act, courts often look to a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). Rehabilitation efforts can be considered, although rehabilitation alone cannot serve

as a basis for compassionate release. *Davis*, 2022 WL 127900, at *1; *see Cohen*, 2022 WL 2314300, at *1 (indicating that district judge erred by failing to consider "positive postsentencing conduct"); *Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

While incarcerated, Wilford has taken various educational and vocational courses. *See* ECF 595-1. He has maintained a relatively clean disciplinary record, considering the length of his incarceration, at least based on the limited records provided to the Court. *See id.* at 4. Furthermore, he discusses at length the assistance and mentoring he has provided to other prisoners. I also note the volume of letters of support that have been submitted by friends, family, and acquaintances on Wilford's behalf. *See, e.g.*, ECF 569; ECF 634; ECF 638; ECF 646. And, Wilford asserts that he has grown and matured while incarcerated; that he "unequivocally accepts responsibility for his criminal conduct" (ECF 595 at 2); that he is remorseful and "makes no excuses for his actions" (ECF 622 at 6); and that he "understand[s] the seriousness of the offense and its affect [sic] on the community." ECF 663 at 3.

It is also noteworthy that defendant has served part of his sentence during the global pandemic. This has arguably "increased the severity of the sentence beyond what was originally

anticipated such that the purposes of sentencing are fully met even with the proposed reduction.*"* *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5, 456 F. Supp. 3d 557 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

To be sure, in some of defendant's pro se submissions, he continues to insist that he has been the subject of extraordinary injustice, requiring the reversal of his conviction. *See, e.g.*, ECF 562; ECF 615; ECF 616; ECF 650.  In his First Supplement, Wilford argues that the "alleged charge of conspiracy against Petitioner, *if at all*, happened not in the State of Maryland but in California . . . ." ECF 615 at 3 (emphasis added).  And, in his letter asserting "Gross Misconduct Through Unfair and Oppressive Acts" by federal law enforcement officials, defendant describes his offense as a "victimless drug charge."  ECF 616 at 1.  Despite overwhelming evidence of defendant's guilt, the content of these filings could be read to cast some doubt on the sincerity of Wilford's assertions of unequivocal remorse and complete acceptance of responsibility.

In any event, the First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release.  *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733,

at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction in Wilford's sentence is warranted.  In particular, I will reduce the sentence for Count One from 340 months to 280 months of imprisonment, with credit for time served in federal custody since September 16, 2011.  This is a reduction of 60 months, or five years.  The sentence, as revised, is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

## V. Conclusion

For the reasons set forth above, I shall deny the Petition.  I shall grant the Motion in part, and reduce Wilford's sentence from 340 to 280 months of imprisonment.

An Order follows, consistent with this Memorandum Opinion.

Date: July 1, 2022                                   _____/s/_____
                                                     Ellen L. Hollander
                                                     United States District Judge

98